# SAMANTHA SULLIVAN v. GIDEON & NORTH ISLAND RAILROAD COMPANY, Appellant.

Division One, April 13, 1925.

1. **APPELLATE PRACTICE: Demurrer to Plaintiff's Case.** In determining whether the evidence made a case which entitled plaintiff in an action at law to go to the jury, where a demurrer to the evidence was overruled by the trial court and the jury returned a verdict for her, the appellate court gives to her the most favorable view of the most favorable testimony in the whole case; and if the defendant did not see fit to call as witnesses the engineer and fireman of the train which ran over and killed plaintiff's husband, the inference will be indulged that their testimony would have been unfavorable to defendant.

Sullivan v. G. & N. I. Railroad Co.

2. **NEGLIGENCE: Contributory: Matter of Law: Railroad Crossing: Neither Looking nor Listening.** A pedestrian, of mature years, with eyesight and hearing capacity unimpaired, who, in broad daylight, at a railroad crossing in a main public street, with which he is familiar, and where the view for a quarter of a mile is unobstructed, without looking or listening for an approaching train, when to look is to see a train of flat cars, moving at the rate of from five to eight miles an hour, backing towards the crossing and only a car-length from it, steps, from a place of safety between the tracks, upon the track on which the train is backing, is guilty of contributory negligence, as a matter of law, where plaintiff's own evidence without contradiction shows such facts, and if he is struck and killed his widow cannot recover damages for his death, although no bell was rung, no whistle was sounded, no trainman was on the rear car to warn him of its approach, and there were noises of saw and planing mills in the neighborhood.

3. ————: **Humanitarian Rule: Stopping Train after Peril Discoverable.** The railroad company cannot be charged with negligence for failure to stop a backing train of fifteen cars within eighteen seconds after a pedestrian's peril of being struck could have been discovered. The train of fifteen flat cars was being backed towards a public street crossing, at a speed of from four to eight miles an hour; a mature pedestrian was guilty of contributory negligence in attempting to cross the track without looking or listening, when to look was to see; the railroad company could not be charged with notice of his peril until he entered the danger zone, which was a space requiring only one or two steps for him to cross; when the car struck him on the west side of the street he grabbed hold of it and was carried eastward a distance, by the furthest possible expansion of the evidence in plaintiff's behalf, of 108 feet, and then fell and was crushed by the wheels of the car; the train was moving, at the lowest estimate of four miles per hour, six feet per second; even if a trainman had been on the lead car and immediately, upon discovering the pedestrian's peril, had signaled the engineer to stop, it would have required three or four seconds for the engineer to receive the signal and effectively apply the stop appliances, and after they were applied the lead car, in taking up the slack, would have traveled seven and a half feet; and after the lead car had thus traveled, it must have been stopped within 8.5 seconds if stopped before he fell, and it could have been stopped in those few seconds only by using the most exact promptitude and under the most favorable circumstances shown by the evidence. *Held,* that the humanitarian rule is not applicable under these circumstances, and a verdict for plaintiff cannot be permitted to stand on the theory that the railroad employees were guilty of

308 Mo. Sup.—4.

negligence in not sooner stopping the train after it became their duty to know the pedestrian's peril.

Citations to Headnotes: Headnote 1: **Appeal and Error,** 4 C. J. sec. 2708. Headnote 2: **Railroads,** 33 Cyc. pp. 1008, 1032. Headnote 3: **Railroads,** 33 Cyc. p. 1049 (Anno).

Transferred from Springfield Court of Appeals.

REVERSED.

*Gallivan & Finch* for appellant.

(1) The deceased having walked from a place of safety onto the railroad track and in front of a moving train without looking or listening, in the daytime, when the view was unobstructed, while he traveled for a distance of twelve or fifteen feet, was guilty of such contributory negligence as bars a recovery, and the court should have sustained defendant's demurrer to the evidence. Burge v. Railroad, 244 Mo. 76; Rollison v. Railroad, 252 Mo. 525; Laun v. Ry. Co., 216 Mo. 563; Underwood v. West, 187 S. W. 84; Keele v. Railroad, 258 Mo. 62; Farris v. Railroad, 167 Mo. App. 392; Blain v. Mo. Pac. Ry. Co., 184 S. W. 1142; Schmidt v. Mo. Pac. Ry. Co., 191 Mo. 215; Green v. Mo. Pac. Ry. Co., 192 Mo. 131; Dyrcz v. Railroad, 238 Mo. 33; Holland v. Railroad, 210 Mo. 338; Mockowik v. Railroad, 196 Mo. 550; Sanguinette v. Railroad, 196 Mo. 466. (2) Where a pedestrian walks in daytime from a place of safety onto a railroad track and immediately in front of a moving train and is struck, there is no grounds for the application of the humanitarian doctrine, even though those in charge of the train were negligent in their operation of the train. Dyrcz v. Railroad, 238 Mo. 33; Burge v. Railroad, 244 Mo. 76; Keele v. Railroad, 258 Mo. 62; Laun v. Railroad, 216 Mo. 563; Reeves v. Railroad, 251 Mo. 169; Rollison v. Railroad, 252 Mo. 525; Farris v. Railroad, 167 Mo. App. 392. (3) No competent testimony having been offered to prove that the train could have been stopped in time to have avoided running over deceased is another reason why no recovery can be had under the humanitarian rule. Burge v. Railroad, 244 Mo. 101.

*T. R. R. Ely* and *George Smith* for respondent.

(1) Before the court will hold that the deceased was guilty of contributory negligence the evidence must be such as to permit no other conclusion than that he was negligent, giving the plaintiff the benefit of every reasonable inference that may be drawn from the evidence. Ruenzi v. Payne, 231 S. W. 294; Easley v. Mo. Pac. Ry. Co., 113 Mo. 236; McNown v. Wabash Ry. Co., 55 Mo. App. 585; Carter v. Wabash Ry. Co., 193 Mo. App. 223; Donohue v. Railway, 91 Mo. 357; Kelley v. Railway, 75 Mo. 138. (2) The rule that one approaching a crossing must look both ways or be guilty of contributory negligence as a matter of law is not so unyielding that it must be applied in all its rigor under all circumstances. Baker v. Railroad, 122 Mo. 523; Kennayde v. Railway, 45 Mo. 255; Russell v. Railway, 70 Mo. App. 88; Harshaw v. Railroad, 173 Mo. App. 459; Weller v. Railroad Co., 120 Mo. 635. The measure of precaution to be observed by a traveler depends upon the circumstances and surroundings of that particular case. (3) A person may be so situated as to be disabled, without fault on his part to look or listen for perils by which he may be menaced, his attention may have been distracted to legitimate objects. Contributory negligence will not in all cases be imputed as a matter of law to a person who receives an injury from a danger simply from the fact that it might have been seen. The surrounding circumstances may be such as to distract his attention to other objects. Only after a failure to look and listen can it be said to be negligence as a matter of law. The issue is ordinarily for the jury to determine. 20 R. C. L. 112, 115; 1 Thompson on Negligence, sec. 189; Ruenzi v. Payne, 231 S. W. 294. (4) The humanitarian doctrine applies in this case. If deceased was uninjured until the rear trucks of the front car passed over his body then, under the testimony most favorable to appellant, said train would have had at least one hundred four feet from the time deceased was in a position of peril to have stopped the train. Ruenzi v. Payne, 231 S. W.

294. (5) Competent evidence was offered to prove that the train could have been stopped in time to have avoided running over deceased. Frick v. Ry. Co., 5 Mo. App. 438.

SEDDON, C.—Respondent (plaintiff) sues for the alleged wrongful death of her husband, J. W. Sullivan, arising out of the alleged negligence of appellant (defendant), in the town of Gideon, Missouri, on September 6, 1919. Her petition charges defendant with negligence in these respects: That, on September 6, 1919, as the said J. W. Sullivan was attempting to cross the railroad main track at a public crossing in Gideon from the south, while exercising due care and caution, he was struck by a flat car of defendant, dragged for a long distance, crushed and run over by said car, from the effects of which injuries he immediately died; that the steam engine of defendant was at the time pushing about fifteen small flat cars from the west and that said engine was about four hundred feet west from said public crossing; that defendant was operating said locomotive and train by unskilled and incompetent employees, and that the brakes being used on said train were wholly inadequate to be effective in operating said train; that the front car being so pushed by said engine was the car which struck deceased at said public crossing; that the agents, servants and employees of defendant who were operating said train at the time negligently failed to sound the whistle on said locomotive engine or ring the bell attached to said engine within eighty rods of said public crossing; that defendant had no one at said public crossing, nor on the car that struck deceased, nor anywhere else, to be on the lookout for persons on said railroad, or approaching said railroad, at said public crossing, to give warning or signals of the approaching train; that said flat cars were not over four or five feet high, and did not extend in height above a team and wagon standing by the track; that said cars were coming noiselessly down the track and deceased had no warning of their approach and did not and could not, by the

use of ordinary care, have seen or heard said train until he was struck by the same; that said train was upon him before, by the exercise of ordinary care, he could have seen or heard it; that, as said car struck deceased, he grabbed hold of said car and held on to it for a long distance in a perilous position, and, finally, his hold giving way, he was dragged under said train while the same was yet moving and killed by said train; that defendant, by the use of ordinary care, could have discovered the perilous position of deceased in time to have prevented his being run over, if it had had a man on the rear car so backing up, or somewhere else, on the lookout for persons on said railroad track at said public crossing to give signals of warning and danger to such persons, as in duty bound it was required to have had, and by the use of ordinary care it could have stopped said train in time to have prevented the death of said J. W. Sullivan; that the agents, servants and employees in charge of said train which ran over deceased and killed him, saw, or by the exercise of ordinary care could have seen, deceased in a place of danger and peril, in time, by the exercise of ordinary care, to have stopped said train and avoided running over and killing him.

Defendant's answer was a general denial, coupled with the defense that "J. W. Sullivan, by his own negligence, directly contributed to his own death by walking, in broad daylight, from a place of safety onto the railroad track over which defendant operated its trains and immediately in front of a train moving over said track, when if he had either looked or listened he could and would have seen said train and avoided being struck thereby."

No reply is shown upon the record, but the cause was tried as though a reply, denying generally the new matter set up in the answer, had been filed.

The evidence adduced by plaintiff tends to show that the casualty occurred between eight and eight-thirty o'clock on the morning of September 6, 1919, at a point where a public road or street in the town of Gideon

crosses the tracks of the St. Louis & San Francisco Railroad Company, jointly used by the latter railroad and defendant company. There are two railroad tracks across this public road, one a main line track, and the other a switch track, running parallel with said main track and immediately south thereof and about twelve feet distant therefrom. The public road runs north and south, and the railroad tracks run east and west, intersecting the public road at approximately a right angle. Deceased was fifty-three or fifty-four years of age, his health was good, and his eyesight and hearing were unimpaired.

Sam J. Harris testified: "I was in a coal car loaded with gravel or road material. The street runs north and south as it crosses the railroad. The local train came backing east, and there was a flat car or two ahead, past the car I was in, and I heard the screams of some women, and I seen Mr. Sullivan with his left arm up on top of the flat car. I didn't see the car hit him. He went about fifty or sixty feet, about the length of two cars, in that position before he fell off. I did not see Mr. Sullivan on the track at the time the train was backing up and before he grabbed the car. There was one car of gravel between me and the crossing; one car of gravel right up against the street, and I was in the second car from the street. I never measured it, but I judge the main line track and the switch track at that crossing anywhere from twelve to fifteen feet or eighteen, something like that, apart. There were cars on both sides of the crossing. There is a little feed barn about fifty or sixty feet of the crossing, on the east side. I was the length of one flat car from the crossing. I never noticed this train backing up from the west until it was right even with us. I don't know how fast it was going; it wasn't going very fast. I did not hear any whistle. No bells were ringing. I did not see any person on the end car going east as it approached that crossing. There was no one on the crossing to give warning to passengers. I don't know how high the cars were the engine was push-

ing; anywhere from four to four and a half feet, I judge. They were standard flat cars. There were about fourteen or fifteen cars in the train. The engine was at the west end of the cars, pushing, going east. The length of the cars was about thirty-six feet, standard average length of cars. It was the train of the Gideon-North Island Company on the Frisco Railroad Company's tracks. Immediately afterward I went to where this man was killed. He was about fifty or sixty feet east of this crossing when he was run over. When I first seen him he had his left arm right on the car, and then he got down in a little ways, and I think it was the two trucks of the first front car and one truck on the second car on the south side of the railroad that ran over him. I am some familiar with the movement and speed of trains. This train was moving anywhere from five to eight miles an hour, just to guess at it. There was a man down about middle ways of the train, anywhere from five to six cars from the east end of the train. He was putting some stakes on flat cars that they load logs on, and he was doing something to those stakes. There was a saw-mill just west of the crossing a hundred and fifty feet. It was in operation that day; just making the usual noise of a saw-mill. Ordinarily it is a loud noise. There was a machine shop on the east side of the street, and south about the same distance from the crossing that the mill is. I think it was in operation on that day. Both the mill and shop were in operation and making the usual noises on that day. The depot is about thirty or forty feet west of the crossing. That makes the crossing east of the depot. That crossing is a public street, the principal crossing of the town, by pedestrians and wagons and teams and cars. I couldn't tell what time in the day; something around eight o'clock, or maybe a little after, in the morning. I don't know as I can state what the condition of the weather was that day. Wasn't raining. The sun might have been shining. I am not going to say it was or it wasn't. It wasn't raining; no falling weather. That street is about forty or fifty feet

wide. When I first saw him he was on the west end of
the crossing and was hanging on the car when I saw him.
I noticed the cars; watched the cars run over him. He
was about fifty or sixty feet down the track from the
crossing. His body was down by the hay barn. The
hay barn was some forty feet from the street. I figure
from where the car hit him about two car-lengths until
where it left him. I don't know how fast the train was
moving; anywhere, I judge, from five to eight miles an
hour; something like that. I don't know the distance be-
tween those tracks; twelve or fourteen or fifteen feet. I
never measured that. There are two tracks there in front
of the depot. The main line track, over which this train
was operated, is the north track and the one nearest the
depot. Parallel with that main track is this switch
track. There were two cars on the switch track west of
the crossing, and I was on the second car. Going from
south to north, you would cross the switch track first.
After you leave the switch track, you would cross a
space probably something like twelve feet, I never meas-
ured it; the usual space between a switch and a railroad.
The parties that were hollering were between the two
tracks, and it was the Shaw sisters. They were coming
across the end of the crossing and were going north, and
their screams attracted my attention and I could see them
between the tracks; between the main line track and the
side track.''

C. W. Smith testified: ''I was in Gideon on the morn-
ing of the 6th of September, 1919. I saw Mr. Sullivan
on that date. I judge it was about 8:30 in the morning,
or possibly a little earlier, that I saw him. I saw him at
what we call the supply house of Gideon Anderson. That
is located about a hundred yards southeast of the pub-
lic crossing of the railroad. I went to the depot; he came
to see me about getting some red oil for the bandmill,
and I went to the depot to see whether the red oil had
come in the evening before on the local. He went along
with me, and just as we crossed the switch of the Gideon-
North Island track I passed on ahead of him; I go over

there frequently and very often and I always hurry along across those crossings, and I passed on ahead of him, he following me, and when I crossed the main line track he was about twenty feet behind me, and I saw—heard somebody holler, and I looked around and saw the car strike him, I suppose, in the breast, and he caught hold of it with his left hand and they dragged him on down east. Mr. Sullivan was on the west side of the public crossing when he was struck.

"Q. Did you see this train coming down as you crossed the track? A. Just as I was crossing the track. It was about thirty feet, I guess, a car-length up the line. I don't know what rate of speed; about what a man would walk. It was going slow. I did not hear any whistle or bell ringing. It seems as I heard a whistle just as we left the supply store, but not on the crossing. A whistle was not blowing and a bell continuously ringing from that time until I saw the train strike Mr. Sullivan. I did not see Mr. Sullivan all of the time from the time he first hung on that car on the west side of the crossing until he fell off and was run over. When I saw him hanging that way I looked away, and when I looked back he was down under the cars. I saw one car run over him—the west end of the east car, what you would call the back trucks of the front car they were pushing. I don't know how far it was from the west line of the public crossing to where Mr. Sullivan was run over by the back trucks of that car. I don't know what the width of that crossing is; I judge it to be a forty-foot crossing, but the main crossing that is used is only about, possibly, not over half of that. It's about a forty- or fifty-foot street, and this crossing narrows when it reaches the railroad to about half of that distance. I observed cars on the switch or side track of the Frisco Railroad when I crossed it that morning. They were Frisco coal cars; cars that are boxed up four or five feet up the sides. I don't know just how close they were to the west line of this public crossing where it crosses the railroad. They were not far, though. They were pretty close. I did

not see anyone on the car that was backing up there to give warning to anyone that might be crossing that public crossing. No warning given, so far as I know. No bell ringing or whistle sounded at that time. I judge it was about twenty or twenty-two feet from the east line of the public crossing to where I saw this car run over Mr. Sullivan. I don't know how far the train carried him until he fell off. He was clear east of the crossing when he fell off. He didn't fall off on the crossing. When I crossed the railroad the train was about thirty feet west of it. I thought the crossing planks were twenty feet long. In traveling from the oil house I went to the northwest. Mr. Sullivan was following me. I came first to the Frisco track that had the gravel cars on it. Then I traveled about twelve to fifteen, I judge it was twelve feet, before I reached the south rail of the main line track. It is about twelve feet from inside rail to inside rail. I didn't turn around to see how far Mr. Sullivan was behind me. I was about twenty feet from him when the car struck him. When I got on the crossing I saw the train and think it was about thirty feet west of me coming east. It was traveling about as fast as a man would walk, possibly five miles an hour, not over that, I don't think. I run across there when I saw this; I run the rest of the way across to get ahead. I first saw the train just as I crossed over the sidetrack. Just as I stepped over the sidetrack I saw the train, then it was about thirty feet. When I crossed the sidetrack I saw the train coming east from the west and I ran on across this twelve-foot and ran across the main line track ahead of the train. I hurried across. Mr. Sullivan was coming along there right behind me and had the same means of seeing the train I had, any more than he was farther back. When he walked up to the same place where I was I suppose he could have seen the train if he had looked. He could have seen it, but the train would have been closer up on the crossing. If Mr. Sullivan didn't see the train until he was within a foot of the track there wasn't anything to prevent him from stopping. I saw the rear

trucks of the front car run over the body, about twenty-two feet from the point where I saw him hanging on the car or holding to the car on the crossing. When I stepped out there that morning there wasn't a thing to keep me from looking down and seeing that train if it had been a quarter of a mile away. I could have seen it when it was fifty feet away. Mr. Sullivan was a few seconds after me; he came twenty feet behind me. It wasn't raining or sleeting. I don't remember whether the sun was shining or not. It was daylight, about eight o'clock in the morning. I say there is not an obstructed view when there is nothing in the way from that crossing west for a quarter of a mile or more on the Frisco crossing. If the railroad company had had a lookout on the back car and there was no wagon or no obstruction between the track, he could have seen a footman crossing the track for a quarter of a mile, the same as a man could that stepped across there. I didn't stand there long when I saw him hanging onto the car, because I looked back around right away when I saw his position. I saw he was in a dangerous position. If anybody had been on the car or if anybody on the track had been stationed there to warn him, they could have seen the same I saw. I signaled the engineer. I judge it is right that the train stopped after it ran about a car and a half length.''

Bill Chadd testified: ''I remember the time when Mr. Sullivan was killed on or near the railroad crossing. I was something like twenty feet from him. I was driving a delivery wagon. At the time the accident happened I was located about twenty feet north of the Frisco Railroad. I saw the train strike Mr. Sullivan. I saw him just a little bit before it struck him. I was on the north side of the Frisco tracks. It was the Gideon-North Island train. I was coming south back to the store, and when I got about fifty feet of where I stopped I heard a whistle blow, and I came on up by the depot and stopped there. I didn't pay any attention to how many times the whistle blew, just knew a train was coming. I don't recollect about hearing a bell ringing. There was

about fifteen cars in the train backing up on this occasion. The cars are about thirty-four feet in length. The whole train was not something like a quarter of a mile long. It was about three hundred yards. There was no brakeman or lookout on the car that was backing up to the crossing; not on that end. There was no one on the crossing to give warning to footmen crossing over it. There are three crossings from the town of Gideon, leading north from the town. The main one was the one he was hit on. That one is something like forty feet, I guess, from the depot, east. I judge the back car was fifty or sixty feet from Mr. Sullivan when he first stepped on the track. That train was running about four or five miles an hour, about as fast as a man can walk. I judge it was running four or five miles an hour, because I can tell about what a man can walk when he walks that fast. It was going about the same speed as a man can walk. I did not see the train stop after it hit Mr. Sullivan. I saw it was going to hit him and I jumped on the car and gave Harry Cook the signal to stop, and I jumped on over and looked down the side of the car and saw he was still under the car, and run for a cot. I didn't see nobody else give a signal. In response to my signal they slowed down a little bit. I saw the train coming, saw it was going to strike Mr. Sullivan, and after it did strike him gave the signal. I never paid any attention whether there was anything between this crossing and the train that would prevent a lookout on the train from seeing Mr. Sullivan approaching this crossing. It was an ordinarily straight track at that time and place. It is a standard-width crossing, I suppose. I judge right where it crosses the railroad it would be narrower than the street. I never paid no attention whether there was any obstruction, car, wagon or anything on the south side of the Frisco Railroad, at the sidetrack, we call it. That was about eight-thirty in the morning. The train dragged him about a rail-length after he was struck. This train was coming from the west, backing up. I heard the train whistle before I got to the depot. When

I got to the depot I stopped. When I stopped I was looking across the crossing down towards Mr. Sullivan as he came from the south, going north. When I seen Mr. Sullivan first, the train was within about fifty or sixty feet away. At that time, Mr. Sullivan was coming across the first track—number one track. Number one track is the sidetrack of the Frisco. That is the track where the coal cars were loaded with gravel and being unloaded. He was coming across there. I can't tell you how far apart those tracks are. I have an idea about twelve or fourteen feet, maybe sixteen. The train was going about as fast as a man would walk. The train might have been going a little faster than the man. About twice as fast; something like that. When Mr. Sullivan reached the north rail of the switch track I think he could see the train if he had looked. Nothing there to keep him from seeing it. After he got across the switch he could have looked down a quarter of a mile and have a clear vision of the track by turning his head slightly. That switch is something like ten, twelve or fifteen feet from the main line track. I never did measure it. When I first saw Mr. Sullivan, he wasn't looking in the direction the tran came; he was looking right towards me; right across where they were working on the road. Seems like he was watching the men unload gravel. Was walking towards the north, and not looking down the railroad track, but looking in front of him. I heard someone else holler and I looked around and saw and I hollered, too. When I hollered, Mr. Sullivan was stepping on the south rail of the track. At that time the train was over two feet from him, I believe, because he looked up; somebody hollered and he looked up. Just as he looked up the train struck him. He just got on the inside rail, then the train struck him. He was not quite in the middle of the track. Seemed like one corner of the car hit him. I can't say about his catching with his hand. I didn't see his hand going up. I would think he would be knocked down in a space of a few feet. I wasn't paying attention. I was trying to give the signal. I don't recollect now whether

I heard the train whistle twice or not. I just heard a whistle and that was about all. It has been so long wouldn't state whether it was a crossing whistle or not. I can't say how far the train that struck Mr. Sullivan was from the crossing when I heard it whistle. I didn't hear it whistle at the time it struck Sullivan; just before that. I can't tell you how long before. Didn't hear no bell.''

Sam Wilhelms testified: ''I am an engineer. I worked for Gideon-North Island Railroad Company. I had had twelve years experience as an engineer. I was not in Gideon on the 6th day of September, 1919, when Mr. Sullivan was killed. At that time, it had been five months since I had been in the employ of the Gideon-North Island. I am familiar with the operation of the kind of engines they had.

''Q. I will ask you to state, if you know, whether or not those engines have brakes on them, and if so, what kind of brakes they were with reference to being adequate to stop the train within the shortest time possible. A. I don't know the condition of that engine. It was equipped with steam-jam in place of air.

''Q. How is it operated? A. By the throttle in your cab and the engineer's valve—steam valve.

''Q. Assuming the engine was equipped with steam-jam brakes, and connected up with the engine and with the cars, and there were fifteen flat cars unloaded, being pushed by this engine, and that the brakes were in good condition, operating conditions, and the train going four or five miles an hour, in what distance could the train be stopped? And also assuming the ground was level at that place, and there was no grade, and the track was dry? A. I would judge twenty to twenty-five feet would be a reasonably good stop.

''Q. Might it not be stopped under those conditions in a less distance than that? A. No, sir. Might be made in eighteen feet. I don't know anything about what was the condition of the brakes on this engine. If the steam-jam brakes was not working and you had to stop

the engine by just using your reverse lever, it would take probably fifty or sixty feet to stop the train. By twenty-five feet I mean that would be a good stop; under circumstances when things were favorable. That doesn't take into account the distance a train of fifteen cars would run out, which is known as slack. I couldn't say about the amount of slack in those type of cars. There is a good deal of slack in those cars, but I can't say how much to the car. The twenty-five feet I am talking about doesn't take into account that a train of fifteen cars would have ten to fifteen feet of slack. The twenty-five feet is from the moment the steam-jam brake is applied. After the signal is given it takes some time for the engineer to receive the signal, get hold of his appliances and operate it. Under ordinary circumstances it would take three to four seconds for a man to receive the signal, get his hands on his appliances and apply it to the point where it would begin to be effective; and a man would be moving pretty rapidly to do it in three or four seconds. During that three or four seconds the train would be moving. I don't count that distance in the twenty-five feet. The twenty-five feet is from the time of the application of the brakes until the engine stops moving, and, of course, then the train of cars goes the distance further that the slack would carry. I don't know how many seconds it would take to stop the train under the circumstances detailed in using steam-jam brake equipment such as they have. It would take approximately about three minutes. From the time you applied the steam-jam brakes it would take two minutes before the train would stop. The distances the train would travel would be the distance the train would travel in two minutes. The conditions would have to be fairly favorable in order to stop the train in two minutes; under fairly favorable circumstances.''

George Fowler testified: ''I was switching for this train that ran over Mr. Sullivan on that day. I was between 200 and 250 feet from the car that ran over Mr. Sullivan. I was east on the main line track of the Frisco.

The ground right around the station at Gideon is level. G. O. Gibson .was in charge of the train on that day as engineer. Harry Cook was in charge as brakeman. I was the conductor in charge of the crew. I certainly don't know whether that train on that day was equipped with adequate brakes. I didn't make any effort after the accident to find out about the brakes. As well as I can recollect, I don't know the condition of the engine at that time, with reference to the brakes. I never did see a car that was equipped with steam-jam brakes—not the cars— the air wasn't coupled up. This train didn't have any air on it that day.

"Q. Now, assuming that the track at the point where Mr. Sullivan was run over was level, and that the track was dry on that day, and that this train which was pushing flat cars, contained about fifteen freight cars, unloaded flat cars, and that they were running about four, five or six miles an hour, how long would it take, the shortest possible distance, to stop that train at that time, assuming also that the train was equipped with adequate steam-jam brakes? A. Its owing to the condition of the slack in the cars whether you could stop the train—how far you can stop, owing to the circumstances if you've got any slack; I don't know how much slack there was in the cars.

"Q. Ordinarily? A. Why, a couple of car-lengths. I don't just exactly know how many minutes. I don't believe it could be stopped in less than two car-lengths; according to the slack the cars had in them. The cars attached to this train were log cars, thirty-four-foot flat cars. The cars were equipped with ordinary couplings and they had equipment on them for air brakes, but they hardly ever used the air brakes. Most of the cars were in good condition except a little worn out in the drawbars, causing four to six inches of slack. Being worn out in the drawbars would cause the drawbars to pull out and make it longer. Then when the train would be pushing fifteen cars ahead, even after the engine stopped dead, still those cars would run out until the slack ran out; in fact, until all the looseness in those couplings would

come out. Considering the slackness in those couplings and considering the weight of the cars and length of the cars and condition of the track, I don't think a man could stop any quicker than two car-lengths, if the train was equipped with steam-jam brakes that were in working order. I couldn't tell from where I was whether any crossing signal was given. Seems as though I did hear a whistle; I wouldn't be positive. I didn't see Mr. Sullivan as he approached the crossing; didn't see him start. If the cars had no slack and a good engine it could stop within eighteen feet.''

The defendant offered no evidence. At the close of plaintiff's case, defendant offered a demurrer to the evidence, which the trial court overruled, to which action defendant at the time duly excepted. The case was submitted to the jury upon several instructions asked by the respective parties. The jury returned a verdict for plaintiff in the sum of $4500. After unsuccessfully seeking a new trial, defendant was allowed an appeal to the Springfield Court of Appeals. A majority opinion was delivered by that court holding that the trial court had properly overruled defendant's demurrer to the evidence, but reversing and remanding the cause because of errors in the given instructions. FARRINGTON, J., dissented, and asked that the cause be certified to this court, because he deemed the majority opinion to be contrary to the following previous decisions of this court: Degonia v. Railroad, 224 Mo. 564; Burge v. Wabash Railroad Co., 244 Mo. 76; Rollison v. Wabash Railroad Co., 252 Mo. 525, and Keele v. Atchison, Topeka and Santa Fe Railway Co., 258 Mo. 62. In accordance with the constitutional mandate (Sec. 6, Art. 6, Amendment of 1884 to Missouri Constitution), the cause was accordingly certified to this court for our determination.

I. The first question, therefore, which confronts us is whether appellant's demurrer to respondent's evidence should have been given. In other words, did respondent's evidence make a case for the jury? If not, then the judg-

ment *nisi* must be reversed; if, on the other hand, it did, then we must further examine the record before us to see if reversible error was committed by the trial court. In passing upon the demurrer, we are rightly required by the law to give the respondent the most favorable view of the most favorable testimony in the whole case. [Zumwalt v. Railroad Co., 266 S. W. 717; Maginnis v. Railroad Co., 268 Mo. 667.] Furthermore, from the fact that appellant did not see fit to call either its engineer or fireman as witnesses (for it offered no testimony on the trial), we are authorized to indulge in the inference that their testimony would have been unfavorable to appellant. [State ex rel. Wabash Railway Co. v. Trimble, 260 S. W. 1000, and cases there collated.] With these primary principles of law in mind, let us now consider the facts as disclosed by the evidence.

*Contributory Negligence.*

The casualty occurred about eight or eight-thirty in the morning in broad daylight. It was not raining or sleeting; at least, there was no "falling weather." Deceased was struck by the train on a public crossing. One witness leads us to believe it was the most used of three public streets or crossings in the town, and within but a short distance of the railroad depot. Appellant had no lookout or flagman stationed at, or in near proximity to, the crossing to warn pedestrians of approaching trains. Neither did it have a switchman stationed on the first or lead car of the train. The evidence tends to show no bell was ringing as the train approached the crossing. The evidence is conflicting as to whether a crossing whistle was blown, but it would appear that no whistle was blown immediately preceding the fatal casualty. There were some cars loaded with gravel or other material on both sides of the public crossing standing upon the switch track, which was immediately south of and parallel with and some twelve feet distant from the main line track. A saw-mill and a machine shop were hard by, in operation and making the usual noises incident to their operation. The road or street was forty or fifty feet wide, but narrowed to half that width in crossing the railroad tracks. De-

ceased started upon his fatal journey accompanied by the witness Smith. As the two crossed, or were about to cross, the switch-track, Smith passed on ahead of deceased and, when Smith crossed the main line track, deceased was about twenty feet behind Smith. Smith testified he first saw the approaching train just as he crossed over the switch or sidetrack. It was then about thirty feet west of Smith, "traveling about as fast as a man would walk," or, as other witnesses estimated, from four to eight miles an hour. Smith ran the rest of the way across to get ahead of the approaching train. Smith said he could have seen the train coming for 200 yards when standing between the two tracks. In fact, he added, "When I stepped out there that morning there wasn't a thing to keep me from looking down and seeing that train if it had been a quarter of a mile away. Mr. Sullivan was coming along there right behind me and had the same means of seeing the train I had, any more than he was farther back. When he walked up to the same place where I was I suppose he could have seen the train if he had looked." Another witness, Chad, testified: "When I first saw Mr. Sullivan, he wasn't looking in the direction the train came; he was looking right towards me; right across where they were working on the road. Seems like he was watching the men unload gravel. Was walking towards the north and not looking down the railroad track, but looking in front of him. When Mr. Sullivan reached the north rail of the switch track I think he could see the train if he had looked. Nothing there to keep him from seeing it. After he got across the switch he could have looked down a quarter of a mile and have a clear vision of the track by turning his head slightly." Deceased was fifty-three or fifty-four years old, in the very prime of life. His eyesight and hearing were good.

As respecting the effect of the foregoing circumstances or state of facts, the Springfield Court of Appeals, in its majority opinion in the instant case, says: "It is contended that the evidence shows as a matter of law that the deceased was guilty of contributory negligence and

for that reason plaintiff could not recover. We agree that the evidence does show that the deceased was guilty of contributory negligence which, on the question of negligence or no negligence alone, would bar recovery. It is thoroughly settled in this State that a railroad track is in and of itself a warning of danger and it is the duty of every person who is *sui juris* and of mature years and in possession of his faculties of sight and hearing to look out for passing trains in approaching a railroad track, and when such a person steps upon the track immediately in front of a moving train without looking, if he could see, and without listening, if he could hear, and is injured, he is guilty of contributory negligence as a matter of law and cannot recover. [Keele v. Railroad, 258 Mo. 62; Burge v. Railroad, 244 Mo. 76; Rollison v. Railroad, 252 Mo. 525; Reeves v. Railroad, 251 Mo. 169.] Many other cases hold the same thing. . . . That deceased was guilty of contributory negligence in stepping on the track immediately in front of the backing train, there can be no question and had he been killed when first struck, there could be no recovery."

The above conclusion of the Court of Appeals coincides with that arrived at by this court after a careful study and consideration of the testimony shown by the record before us. It is also in consonance with the decisions of this court cited in the majority opinion, and other cases, as well, not therein cited. There is no escape from the conclusion that deceased in the instant case was guilty of contributory negligence as a matter of law.

In Dyrcz v. Railway Co., 238 Mo. l. c. 47, a case where a pedestrian stepped in front of a moving freight train, we said: "Accordingly, as a general rule, in the administration of justice in this kind of case, a person in the act of crossing such track must before entering on it look and listen. If he does not and is injured in crossing he is guilty of negligence, he contributes to his own injury and is hurt by his own fault. In such case, the best the law can do is to leave him where he puts himself; for no action lies. Moreover, given daylight and no obstruc-

tions, given a situation where to look is to see, then such person is conclusively held to see; for on that hypothesis looking is equivalent to seeing. Hence, for one to say (as plaintiff does) that he did not see an engine bearing down upon him and so close to him as to strike him as he crossed the track, is precisely the same as if he had said he did not look at all. No judgment should stand on an impossibility; for example, on the fact that one saw around a corner with a naked eye, or through a solid stone wall, or in broad daylight looked and did not see a locomotive engine hard by on a straight and unobstructed track. Under the doctrine of many cases, plaintiff's own testimony puts him in the fix of a man who negligently moves from a place of safety beside the track to a place of danger from a going locomotive on a track, and immediately before it. In that view of it there is no room to apply the last-clear-chance or humanity rule. Contra, plaintiff's negligence is the proximate cause of his injury. [Green v. Railroad, 192 Mo. 131; Schmidt v. Railroad, 191 Mo. 215; Mockowik v. Railroad, 196 Mo. 1. c. 570 and cases cited; Eppstein v. Railroad, 196 Mo. 1. c. 733; Stotler v. Railroad, 204 Mo. 619; Laun v. Railroad, 216 Mo. 563.]''

In another pedestrian case, Vandeventer v. Railroad Co., 177 S. W. 1. c. 838, we said: ''The contributory negligence of plaintiff's husband bars her from a recovery in this case. It may be conceded for the purposes of the argument that the question as to whether the cars upon switching track and the buildings south of same obstructed, to some extent, the view of deceased as he traveled north on the board walk, was one for the jury; but as soon as deceased stepped over the north rail of the switch track he had a clear, unobstructed view west for more than a mile, and could not help seeing the approaching train, with its brilliant headlight, had he looked in that direction. The distance between the north rail of the switch track and the south rail of the main track at the board walk was 8.8 feet. The train was approaching from the west on the main track. . . . It was the duty of deceased to look and listen for the approaching train

after he got in the clear between the two tracks, and before passing onto the main track. That which he could have learned by the exercise of ordinary care under such circumstances will be imputed to him as a known fact. [Citing cases.] So that, as a matter of law, we are bound to hold, on the undisputed facts presented in this record, deceased, while between the two tracks, in a place of safety, knew the locomotive with its brilliant headlight was approaching from the west on the main track.''

Again, in the later case of Rollison v. Railroad Co., 252 Mo. l. c. 542, we said: ''Furthermore, the case on the facts is also brought within the rule of the law of negligence, to-wit, that when a man without looking moves from a place of safety beside a railroad track to a place of danger on the track, and immediately before a coming locomotive, then, in the eye of the law, his negligence in so doing becomes the proximate cause of his consequent hurts, hence there is no room for the play of the humanity doctrine in any of its phases or for recovery.'' [Citing cases in support of the rule.]

Nor can we agree with respondent that the facts in the instant case bring it within the rule announced by the Kansas City Court of Appeals in Ruenzi v. Payne, 231 S. W. 294. In that case the humanitarian rule was held to apply because the attention of deceased was attracted to what she thought was apparent danger from a freight train approaching in the opposite direction on the next parallel track, making it impossible for her to hear and distracting her attention from the approach of the passenger train which struck her on the adjoining track. In delivering the opinion of that court, TRIMBLE, P. J., recognizing the general rule above stated, however, said: ''It has been several times held by the Supreme Court, and it is well settled not only in decisions of that but of the other courts of our State, that when one knowingly approaches a railroad crossing he must look both ways, and, if he does not, it is negligence that will defeat a recovery.'' [Citing numerous cases.]

Here there is no evidence that deceased might have been confused or alarmed by an apparent approaching

danger upon the switch track adjoining the main line track. Neither is there substantial evidence that the gravel cars standing upon the switch track seriously impeded his vision, nor that the usual noises incident to the operation of the saw-mill and machine-shop prevented his hearing the approach of the backing freight train. At least two of the respondent's witnesses saw the train before it reached the crossing, and, had deceased looked or listened when in a place of safety between the switch track and the main line track before taking the fatal few steps which brought him immediately in front of the approaching train, he would have escaped injury, as did his companion Smith, who immediately preceded him. His failure to use reasonable and ordinary care for his own safety convicts him of contributory negligence as a matter of law under the uniform holdings of this and other courts of our State.

II.   We now come to respondent's contention, strenuously urged here as it was in the Court of Appeals, that, since deceased was not knocked down and killed when first struck by the flat car, but succeeded in hanging onto the car for a space of some seventy to eighty feet, the train could have been stopped and his life saved while the train was traveling that distance and within the space of time within which the train might reasonably have been stopped. The majority opinion of the Court of Appeals adopted respondent's viewpoint on this contention, for that court says in the majority opinion: ''The accident occurred at a public street crossing in town where persons might be expected to be on the track at any time. This imposed on those in charge of the train the duty to keep a lookout for persons on the track. The track was straight, the ground level, the train consisted of fourteen or fifteen flat cars, hence there was nothing to prevent the engineer or a person stationed on the train as a lookout from having seen Sullivan at the time he was struck. The defendant, then, must be held to the same responsibility, as would attach if he had been, in fact, seen by those in charge of the train when he was struck.'' The majority

opinion then, after a mathematical calculation based upon the distance deceased was carried after being struck, taken in connection with the testimony of the expert witness as to the shortest distance within which the train might have been stopped, arrived at this conclusion: "We think there was, however, sufficient evidence to take to the jury the question of the duty of those in charge of the train to have seen deceased when the backing train struck him and to have seen his position of peril as he hung on the end of the car and also the question whether the train could, with ordinary care, have been stopped before deceased lost his hold on the car and fell, and on that theory, and that only, should the case have gone to the jury. The demurrer to the testimony was properly overruled." FAR-RINGTON, J., holds, in his dissenting opinion, that "the judgment should be reversed outright because there is insufficient evidence to base a finding of negligence under the humanitarian rule. The time within which to act after the deceased was struck through his own negligence until he was run over by the train was too short. A verdict of finding defendant's agent guilty of negligence under these circumstances could only be based upon the wildest conjecture."

Let us then examine the record, having in mind, as did the Court of Appeals, the facts most favorable to respondent's theory of recovery under the humanitarian rule. Deceased was struck at approximately the west side of the road crossing and carried, according to most of the witnesses, to a point fifty or sixty feet east of the east line of the road crossing, where he lost his hold on the car and met his death. The road was about forty feet wide, but narrowed to half that width, or twenty feet, where it crossed the railroad tracks. It therefore follows, under the evidence, that deceased was carried from seventy to eighty feet by the moving train before he fell from the car. If the train were traveling four miles per hour, the slowest rate of speed fixed by any witness, it was moving at the rate of slightly less than six feet per second. According to the expert witness it would require about

three or four seconds for the engineer to receive the signal, get his hands on the proper appliances and apply them so as to be effective, and as witness said, "a man would be moving pretty rapidly to do it in three or four seconds." In three seconds the train would travel eighteen feet, and in four seconds it would travel twenty-four feet. The evidence shows there was four to six inches of slack to each car, and, assuming there were fifteen cars in the train and allowing six inches of slack to each car, the train would travel seven and one-half feet before taking up the slack after the engine was completely stopped. The expert witness, Wilhelms, testified that, under the most favorable conditions, "twenty to twenty-five feet would be a reasonably good stop," without taking into account either the slack or the distance traveled while the engineer was receiving the signal and using the necessary appliances to stop. Allowing twenty-five feet as a reasonably good stop and adding thereto twenty-four feet traveled during the four seconds of time in which the engineer was receiving the signal and applying the instrumentalities at hand, plus seven and one-half feet of slack, the car on which deceased was hanging might have been stopped in 56½ feet after he was struck. Taking 70 feet as the distance he was carried by the train, the train ran 13½ feet beyond the dead line, where the expert said it might have been stopped; or, if we assume he was carried 80 feet, an assumption more favorable to respondent, the train ran 23½ feet beyond the dead line where it might have been stopped. By reducing distances in feet to seconds of time, we have the following result:

| Distance Traveled at 4 Miles Per Hour. | | Time. |
|---|---|---|
| 24 | feet while engineer reaches appliances, takes .................... 4 | seconds |
| 25 | feet distance in which train may be stopped, takes .................. 4 2/12 | seconds |
| 7½ | feet slack in train, takes .......... 1 3/12 | seconds |
| 56½ | feet in which train might have been stopped in ..................... 9 5/12 | seconds |

70 ˙ feet distance deceased was carried
        in ...............................11 8/12 seconds
56½ feet in which train might have been
        stopped in ...................... 9 5/12 seconds

13½ feet over the dead line, or ........2 3/12 seconds

If, on the other hand, deceased was carried a distance of
80 feet, then he was carried 23½ feet over the dead line,
or 3.9 seconds. And, going one step farther and assum-
ing the engineer could have received the signal and used
the appliances in three instead of four seconds, deceased
was then carried 29½ feet over the dead line, or 4.9
seconds, less than five ticks of the watch.

But respondent says that, under the evidence most
favorable to respondent, we must presume that deceased
was struck on the west side of the road, and that the road
was forty feet wide at the railroad crossing (a fact not
borne out by the testimony), and that deceased was car-
ried not less than two car-lengths, or sixty-eight feet, east
of the east line of the road, being a total distance of 108
feet, before he was killed. But even allowing respondent
the benefit of that extreme presumption, deceased was
carried but 51½ feet over the dead line, and it takes just
18 seconds, slightly more than a quarter of a minute, for
the train to travel the total distance of 108 feet, or 8½
seconds over the time required to stop the train under
the most favorable circumstances shown by the testimony.
But let us now pass from the realm of mathematics to
the application of the established principles of law to
the proven facts in the instant case.

Even though we may assume (although we do not
find it necessary to so rule) that appellant is chargeable
with negligence in not placing a lookout or switchman
upon the lead car of the backing train for the purpose of
signaling to the engineer in case it became necessary to
suddenly stop the train, such lookout or switchman, had
he been so placed on the lead car, would have had the
right to rely on the deceased looking and listening for
the approaching train and stopping until it had passed;

at least, he might have relied on such presumption until deceased had reached the danger zone and was in actual peril from the oncoming train, thereby indicating his obliviousness to the danger. This danger zone at most was within but a step or two of the main line track, and the few steps taken by deceased while within the danger zone will add not more than two or three seconds to the time within which the train operatives were reasonably required to act, even under a liberal application of the humanitarian rule.

In Keele v. Railway Co., 258 Mo. l. c. 79, this court, in banc, said: ''The duty to use care to avoid injury on the hypothesis discussed in paragraph 2, arises only on discovery of peril, or on negligence in discovering it when there is a duty to keep an outlook and make discovery of the peril. In either hypothesis it is essential to note that there must be *peril,* a danger zone. . . . But a person *sui juris* approaching a railroad track at a crossing, at an ordinary gait on foot at right angles to the track or angling toward the engine and in complete control of his own movement, is not in the danger zone until he takes the last few fatal steps, or, oblivious to his danger, does such things as fairly indicate a present intention to take them. The danger zone on such hypothesis is narrow indeed—a step or two or three at most. We have uniformly ruled that the engineer seeing such a person approaching the track on foot in an ordinary walk may act on the presumption the person will stop before stepping thereon immediately before his engine. He has the right to rely in the first instance on such person looking and listening, and, where looking is seeing and listening is hearing, he has a right to presume such person knows the peril and will stop.''

On the question of time within which the railroad operatives in charge of a train must act under the humanitarian rule, we said in Burge v. Wabash Railroad Co., 244 Mo. l. c. 102: ''Taking the outside limit of 1,000 feet, the engineer only had 11 4/11 seconds, from the time his engine rounded the curve, to discover the peril of de-

ceased, to sound his alarms, and to apply his brakes. Human beings can't work with the rapidity of electricity. Thoughts must be gathered and nimble fingers and hands put in motion. Seconds fleet by. They are unlike minutes. We say in this case as we did in the Degonia case, 224 Mo. l. c. 596: 'Yet defendant is held liable for not saving life, with only ten seconds—ten ticks of the watch—in which to act.' In the case at bar if the train was going as fast as some of plaintiff's witnesses put it there was less than ten seconds in which to act, and even if going as slow as defendant's witness put it, there was but little more. We do not believe that the facts of this case authorize its submission to the jury even upon the humanitarian rule."

Again, in the later case of Rollison v. Railroad Co., 252 Mo. l. c. 541, we said, in banc: "To predicate negligence on two seconds of time is in and of itself a monumental refinement. We cannot adjudicate negligence on such pulse beats and hairsplitting, such airy nothings of surmise."

We agree with Judge FARRINGTON, as he remarks in his dissenting opinion, that "the time within which to act after the deceased was struck through his own negligence until he was run over by the train was too short." The demurrer offered by appellant at the close of the evidence should have been given by the trial court.

The judgment *nisi* should be reversed outright, and it is so ordered. *Lindsay, C.,* concurs.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur.