GENIE MADDUX v. HENRY A. GARDNER, TRUSTEE, AND B. A. MARBLE— 192 S. W. (2d) 14.

Kansas City Court of Appeals. December 3, 1945.

*Charles M. Miller* for appellants and defendants.

*George A. Spencer* for respondent and plaintiff.

292

BLAND, P. J.—This is an action for wrongful death, prosecuted against the trustee of the Chicago & Alton Railroad Company and one Marble, alleged to have been the engineer on the train that ran over the deceased. There was a verdict and judgment in favor of plaintiff in the sum of $2500. Defendants have appealed.

Plaintiff is the widow of Ara T. Maddux, deceased, who was struck by a train while he was crossing Allen Street, at the Alton Railroad tracks in Centralia. The collision occurred about 2:00 P. M., on March 19, 1942, on a clear day. Deceased was 68 years of age. Allen Street extends north and south. The railroad tracks cross it at right angles.

Plaintiff's witness, Vernon, testified that he was standing in the depot of the railroad station a short distace east of the crossing at the time of the casualty; that the train approached from the west and

that the railroad tracks were straight for a quarter of a mile west
of the point of the collision; that deceased proceeded on the west side
of Allen Street going south across the tracks, which consist of a main
line and two side tracks, the main line being the south track; that de-
ceased "habitually walked slowly. He had a habit of walking with
his head down a little to one side, he was looking down. He would
have his head cocked to the right looking a little to the left"; that
deceased was walking in his usual manner at the time he approached
the tracks and when he was struck; that the train was approaching
at a rate of speed of fifteen or twenty miles per hour; that deceased
had gotten almost clear of the train at the time of the casualty; that
he was struck by the pilot beam of the engine, which was nine or
ten feet long: "I don't think it was more than 4 to 6 inches that
hit him"; that deceased was struck on the arm; that up to the time
that he saw deceased fall he though that deceased had cleared the
track; that it would not have taken another step for deecased to
have been in the clear; that the train did not start to slow down until
immediately after deceased was struck.

There was evidence that coming into town the train crossed two
or three other streets; that it whistled before entering the city and
upon the street crossings; that when leaving one crossing it would
whistle for the next one; that the block immediately west of Allen
Street is 260 to 270 feet long and that it whistled when it reached a
point in the middle of this block and continued to whistle until de-
ceased was struck.

The witness, Vernon, testified that he heard the train whistle four or
five times "up the track". The witness further testified that there
was a freight train standing on the side track about 400 or 500 feet
east of the crossing, headed west; that it was waiting to pull out as
soon as the westbound train went by.

Plaintiff's witness, Hunt, testified that he was the agent-operator for
the Alton Railroad at Centralia; that he was at a point west of the
station seven to ten feet east of Allen Street and about sixty feet
from the point of the collision; that he saw deceased approaching the
place of the collision; that deceased was looking down at the side-
walk and perhaps several feet ahead of him until "a second before
he was hit. Then he turned his head toward the engine of the ap-
proaching train to the west"; that the train sounded its whistle as it
approached the city; that when the train first came into view it was
proceeding at the rate of about twenty-five miles per hour; that the
train reduced its speed and was going at the rate of fifteen or twenty
miles per hour at the time deceased was struck; that the train gave
four whistles for each street crossing; and when it was a half block
from where it struck deceased the engineer "gave an unusual blast
for him" (deceased). On cross-examination he stated that this whistle
was the regular whistle for the crossing; that he could not say whether

the engineer gave an unsual whistle for the deceased; that what he heard was the regular crossing whistle; that he did not hear the train standing on the side track headed toward the west make any noise; that he observed deceased approaching the tracks; that when he first saw him he did not think that he would go over the tracks without stopping; that when deceased was 10 or 12 feet from the north rail of the main line, upon which the train was approaching, the witness thought that deceased was going on across the tracks. Later he testified that he did not know that deceased was going upon the main line track until the latter "approached the north rail close to the main line"; that deceased could have stopped in a fraction of a second; that he judged that the train was composed of forty cars; that freight trains cannot be stopped as quickly as passenger trains; that the engineer was on the south or right-hand side of the engine.

Plaintiff testified that deceased was alive when she arrived at the scene of the collision; that he was taken to Mexico in an ambulance; that shortly after he was put in the ambulance she asked him "why he stepped before a moving train", and he replied, "I was looking at the other one. I didn't know this one was on the track".

Defendant's witness, Gerrard, testified that he saw deceased lying on the ground; that he went over to where he was and he heard him say that he "thought he was far enough over to keep from being hit".

The undisputed evidence shows that the train was bearing down upon deceased with its whistle sounding almost continuously until he was struck. There was nothing on the side tracks or any other place to obstruct the view of the deceased. There is no evidence that deceased's hearing was defective or that the train headed west constituted any threat to him. There is no clear explanation in the record as to why he proceeded on in front of the train. It is difficult to understand why he did so unless he was under the impression that it was approaching on one of the side tracks, as he stated to his wife, "I didn't know this one was on the track" and, to the witness, Gerrard, that he "thought he was far enough over to keep from being hit".

However, it is immaterial as to why he did not avoid being struck. The case was submitted upon the humanitarian theory and contributory negligence is not a defense.

This cause was barred by the Statute of Limitations, Section 3656 Revised Statutes Missouri 1939, unless it was begun within one year after the date of the death of the deceased. He was killed on March 19, 1942. The suit, to recover $10,000 damages, was filed on March 4, 1943, against the Chicago & Alton Railroad Company, the Trustee and "John Doe", alleged to have been a citizen and resident of the State of Missouri, and the engineer on the train in question, and "Richard Roe", alleged to have been a citizen and resident of the State of Missouri, and the fireman on the train. No service of process

was had on John Doe or Richard Roe. These were unquestionably fictitious names.

On January 7, 1944, more than one year after the date of the death of the deceased, B. A. Marble and S. B. Allison were made defendants. The petitioner was amended by interlineation and the names John Doe and Richard Roe were dropped and B. A. Marble and S. B. Allison were submitted and the amended petition described them as the engineer and fireman, respectfully, of the train in question. At the close of the evidence the plaintiff dismissed as to the Alton Railroad Company and Allison.

It is insisted by the appellants that "There is no statement in the petition that these names (John Doe and Richard Roe) were fictitious, even, if without a statute, a defendant (Marble) might be sued under a fictitious name if his real name was unknown to a plaintiff, which appellants deny, appellants asserting that, as there is no statute in this state providing for suing a defendant by a fictitious name where plaintiff is in ignorance of the real name of the defendant, . . . such cannot be done". In this connection Parks v. Talmann, 113 Mo. App. 14 is cited. In that case plaintiff sued to collect wages from her employer, using her maiden name, when she was well known to her friends by her married name, the employer having a rule against hiring married women. The court held that the suit should not have been brought in her maiden name but in her real name. We will later demonstrate that this case is not in point.

"Where a fictitious name stands alone in its designation of a party to the action and imports no legal entity, *and where the complaint itself is silent as to the character of the party so designated,* an amendment cannot be allowed, adding to the fictitious designation the name of an individual as the person in whose favor the action is prosecuted. But where the complaint discloses that the action is brought by a legal entity under a fictitious name, the fictitious designation may be so amended as to add the name of the legal entity". [47 C. J., p. 240.] (Italics ours.)

The petition alleges that the suit was brought against John Doe, as the engineer of the train in question. It is true, it does not allege that John Doe was a fictitious person or that plaintiff did not know the real name of the engineer. However, it is well understood that the name "John Doe" is a fictitious one, and that the name was a fictitious one in this instance is further demonstrated by the use of the name "Richard Roe" as the fireman. *Corpus juris* defines "John Doe" as *"A FICTITIOUS NAME* frequently used to indicate a person for the purpose of argument or illustration, or in the course of enforcing a fiction in the law, the name which was usually given to the fictitious lessee of plaintiff in the mixed action of ejectment". (Italics ours.) [33 C. J., p. 835.]

The petition discloses that it was the intention of plaintiff to sue the engineer of the train and, as there could have been no reason for her to have used the name "John Doe" to designate the engineer, if she knew who was the engineer, it will be inferrd that plaintiff did not know his name at the time of the filing of the petition. (Herein this case differs from Parks v. Tallman, *supra*.) The amending of the petition by inserting the name, Marble, was not the addition of another party to the cause of action but constituted a mere substitution of names. While no service of summons was had upon Marble, within the statutory time, or until after the expiration of one year from the date of the death of deceased, the service of summons did not constitute the commencement of the suit as against Marble. Suit was begun when the petition was filed against John Doe, (McGrath v. The St. L., K. C., & C. Ry. Co., 128 Mo. 1; City of St. L. v. Miller, 145 S. W. (2d) 504; Section 876 R. S. Mo. 1939; see, also, Green v. Sup. Lodge, etc., 79 Mo. App. 179), who was alleged to have been the engineer, and the amendment related back to the time of the filing of the petition. [World Fire & Marine Ins. Co. v. Alliance Sandblasting Co., 136 Atl. (Conn.) 681.] In Walker v. Wabash R. R. Co., 193 Mo. 453, 474, the court, quoting from another Missouri case, stated: "Where the amendment sets up no new matter or claim, but is a mere variation of the allegations affecting a demand already in issue, then the amendment relates to the commencement of the suit, and the running of the statute is arrested at that point; but where the amendment introduces a new claim, not before asserted, then it is not treated as relating to the commencement of the suit, but as equivalent to a fresh suit upon a new cause of action, the running of the statute continuing down to the time the amendment is filed".

It follows that the suit against Marble is not barred by the statute of limitations.

Defendant's trustee insists that this action cannot be prosecuted against him and, therefore, his instruction in the nature of a demurrer to the evidence should have been given. In this connection it is pointed out that the casualty occurred prior to the appointment of the trustee, and it is urged that the trustee cannot be held liable for a tort of this kind committed by the Chicago & Alton Railroad Company. In support of this contention said defendant cites Allen v. St. L. & S. F. R. R. Co., 184 Mo. App. 492; Northern Pac. R. R. Co. v. Heflin, 83 Fed. 93 and Decker v. Gardner, 26 N. E. 814. It is held in the Northern Pacific and the Decker cases that a receiver cannot be held liable for a tort committed prior to his appointment. However, each of those cases involves a receiver appointed in equity to manage and operate a railroad during the pendency of the action, or *pendente lite*. The last case cited recognizes the difference between a receiver appointed *pendente lite* and a statutory receiver. Regarding the former the court said, l. c. 816: "His functions were confined to the care and

preservation of the mortgaged property, and his appointment gave him temporary management of the railroad under direction of the court, nothing more".

The trustee in the case at bar is a statutory official. He is vested with title to all the assets of the railroad company as the representative of that company and he takes its place in respect to the custody and administration of its affairs, and toward its claimants and creditors he occupies a relation analogous to that of an administrator of an estate. Under such circumstances he is liable as trustee for the tort of the railroad company committed prior to his appointment. [11 U. S. C. A., sec. 205; Snow v. Thompson, 178 S. W. (2d) 796; Combs v. Smith, 78 Mo. 32; Grant v. O. K. C. & E. Ry. Co., 94 Mo. App. 312; Victor Talking Machine Co. v. Hawthorne, etc., 173 Fed. 617; Decker v. Gardner, 11 N. Y. S. 388; Farris v. Receivers, 20 S. E. 167 (N. C.); Martin v. Forrey, 193 N. E. 679 (Ind.); 65 C. J., p. 868.] The question of the classification of any judgment recovered as a claim against the estate of the bankrupt is not now involved.

The case of Allen v. S. L. & S. F. R. R. Co., cited by the defendant went off on the question of consent of the court, appointing the receiver, that he might be sued.

However, it is claimed that under the provisions of Title 11, sec. 205-J U. S. Code Ann., relating to bankruptcy, only the debtor, or the railroad company, is liable in this suit, and not the trustee. That section provides: "In addition to the provisions of section 29 (providing that a suit which is founded upon a claim for which a discharge would be a release, and which is pending against the person at the time of the filing of the petition in bankruptcy shall be stayed until after an adjudication or dismissal of the petition, etc.) of this title for the staying of pending suits against the debtor, the judge may enjoin or stay the commencement or continuation of suits against the debtor until after final decree; and may, upon notice and for cause shown, enjoin or stay the commencement or continuance of any judicial proceeding to enforce any lien upon the estate until after final decree: *Provided, That suits or claims for damages caused by the operation of trains, busses, or other means of transportation my be filed and prosecuted to judgment in any court of competent jurisdiction and any order staying the prosecution of any such cause of action on appeal shall be vacated".* (Italics ours.)

It has been ruled that, under the general provisions of the bankruptcy act, a claim founded upon a tort of this kind is not such a one that can be proved in bankruptcy. Therefore, the discharge of the bankrupt would not release the same. [In re Crescent Lbr. Co., 154 Fed. 724; Imbriana, Adm'x. v. Anderson, 76 N. H. 491; In re N. Y. Tunnel Co., 159 Fed. 688; 7 C. J., pp. 300, 308; 8 C. J. S., pp. 1232, 1239.]

Section 205-J provides that courts may stay the commencement or the continuation of suits against a debtor in cases other than those mentioned in Section 29, but prohibits the court from staying suits or claims for damages caused by the operators of trains, etc. This and, perhaps, other provisions of section 205, recognizes the right of damage suit claimants, such as described in section 205-J, to participate in the fruits of the reorganization or the distribution of the assets of the bankrupt. The language used in the proviso of sub-division J seems to refer to suits against the debtor (in this case the Railroad Company) but there is no express prohibition in the sub-division against bringing a suit against the trustee of the debtor. It was well said in Martin v. Forrey, 193 N. E. *supra*, l. c. 681: "To obtain a judgment against the corporation for such injuries, and then by petition or other means have it transferred to the receivership, would be doing indirectly what appellees insist cannot be done directly, to-wit, obtain a judgment on the appellant's right of action against the assets in the hands of the receiver." The law does not require the doing of useless things. Under the circumstances, there can be no complaint that the suit was brought against the trustee in the first instance.

It is insisted by the defendant, Marble, that his instruction in the nature of a demurrer to the evidence should have been given for the reason that there is no evidence that he was the engineer on the train. This contention must be sustained. Plaintiff attempts to use certain alleged incidents in connection with the trial, which are not shown in the record, to establish the fact that Marble was the engineer. Of course, such matters cannot be considered by us. Marble was not called as a witness and plaintiff states, in this connection, that the court should indulge in the inference that his testimony would have been unfavorable to him, citing in support thereof, the case of Sullivan v. Gideon, 271 S. W. 983, but such inference cannot be substituted for proof of the facts necessary to be established in order for plaintiff to make out a case.

It is insisted by the appellants that there is no evidence of negligence on their part and, for this reason, their demurrers to the evidence should have been sustained. The negligence of both Marble and the Railroad Company, submitted in plaintiff's instructions, is founded wholly upon the acts of Marble, the engineer and, therefore, the demurrers to the evidence must be judged from this standpoint not only as to him but as to the trustee. [Guthrie v. City of St. Charles, 152 S. W. (2d) 91, 94.] There is no evidence as to what either the engineer or the fireman was doing at the time in question except to the effect that the engineer was seated on the right side of the engine or the opposite side from which decased approached the track. Appellants insist that "the evidence is that deceased Maddux was walking south and the train was moving east. There is evidence

the engineer was on the right hand side, and that Maddux came on the main line track from the left hand side of the train. There is no evidence the engineer ever saw Maddux, or, that the engineer ever had a view of Maddux before he was struck. Nor is there any evidence the engineer did not apply the brakes as soon as he saw Maddux, if he did see him. Nor is there any evidence as to what distance it would take to slacken the speed of the 40 car freight train after the brakes were applied''. One of the acts of negligence alleged in the petition is that the operators of the train failed to slacken the speed thereof.

There was evidence that the deceased, as well as the operators of the train, had a clear view of the track for a distance of at least a quarter of a mile. The station agent, Hunt, testified that he thought that deceased was going on across in front of the on-coming train when deceased was 10 or 12 feet north of the north rail of the track. Why he arrived at such a conclusion he did not state. He later stated that deceased could have stopped in a fraction of a second, a fact that this court judicially knows. Defendants say that the engineer was situated on tht right hand side of the engine and was not in as favorable position as Hunt because the boiler began to obscure his view at some point and there is no evidence as to what this point was or what was the length of the boiler.

It was admitted at the trial by the appellants that a man ordinarily walks at the rate of speed of about three miles per hour. The evidence is that deceased was walking slowly and more slowly than a man ordinarily walks. If deceased was proceeding at the rate of two miles per hour, he was traveling approximately three feet per second when he reached a point approximately two feet from the overhang of the train. We may assume for the purposes of the case that he was then in a position of peril. He hardly was in such a position before that time, because he could have stopped almost instantly. Taking the length of the beam as ten feet the overhang of the train to the north was approximately ten feet north of the point where deceased was struck. In other words, he traveled about twelve feet from the point where he got into a position of peril to the point where he was struck. It, therefore, took him about four seconds to travel the twelve feet in question. If the train was proceeding at the rate of twenty miles per hour, or approximately 30 feet per second, and had four seconds in which to slow up, it must have been about 120 feet from deceased at the time he entered a position of peril. The evidence shows that deceased lacked less than a step to have cleared the beam of the train. In this connection the witness, Vernon, testified: ''He could not have taken another step''. If the train had been slowed down, deceased would not have been struck. There was evidence that the train did not slow down prior to striking deceased. Was the engineer negligent in not slowing down the train before it struck de-

ceased? The answer to this question depends on whether the former saw or could have seen deceased in a' position of peril in time to have slowed down. (only a slight slowing of the train would have permitted deceased to have escaped as he lacked less than a step of being in the clear.) But there is no substantial evidence that the engineer could have so seen deceased. There is no evidence of the length of the engine boiler, or, to what extent it obstructed the engineer's view. The engineer had about 120 feet in which to have seen deceased in a position of peril *and thereafter* to have slowed the train. Assuming that he saw deceased as the latter entered a position of peril did he thereafter have sufficient time to slow the train enough to have permitted deceased to have escaped? There is no evidence on the subject. There is no evidence as to whether the train was going down or up hill. Plaintiff speaks of slack between the cars. If the train was going down hill there probably was no slack. If the train was slowed from twenty-five miles per hour to twenty there may have been no slack. We are not advised how long it takes the brakes to slow down a forty-car train, the conditions not being given. We are of the opinion that the demurrers to the evidence should have been sustained.

It is insisted that the court erred in giving plaintiff's instruction No. 1, but as this assignment is not developed it will not be considered. [Mason v. Wilks, 288 S. W. 936.]

The judgment is reversed and the cause remanded. All concur.