MARGARET E. SULLIVAN, Administratrix of Estate of JOHN L. SULLIVAN, Appellant, v. ATCHISON, TOPEKA & SANTA FE RAILROAD COMPANY, WILLIAM A. DELONG and C. W. HOSFORD.—297 S. W. 945.

Division One, July 30, 1927.

1. **NEGLIGENCE: Plaintiff's Witnesses: Contradictory Testimony: Question for Jury.** One of plaintiff's witnesses having testified that he was on the flat car at the rear end of the train backing towards the street crossing and gave the engineer and other brakeman a signal to stop, and others that no one was on the car and that no signal was given, the question of defendant's alleged negligence in failing to observe an ordinance requiring the railroad company to have a man stationed on the top of the car at the end of a backing train, to give warning signals, became one for the jury, as did

also the question whether the brakeman could have given timely warning to the occupants of an approaching automobile after discovering their peril.

**2. CONTRIBUTORY NEGLIGENCE: Imputed to Passenger in Automobile.** A person riding in an automobile driven by the owner, where no such relation between him and the driver exists as would impute the negligence of the driver to him, is not absolved from all care for his own safety, when the automobile approaches a railroad street crossing and is struck by a train, but is required to use such care to avoid injury as an ordinarily prudent person would exercise under like circumstances.

**3. ————: ————: Obvious Danger.** The trial court properly gave a peremptory instruction for the defendant railroad company where plaintiff's evidence was that deceased was killed when an automobile owned and driven by his sister was struck by a train backing across a public street; that he never drove the automobile, but it was customarily driven by her and he accompanied her; that they often drove to the town, and the crossing and its surroundings were well known to them; that in the middle of the afternoon of a clear day, the automobile was driven towards the crossing at ten or twelve, and perhaps fifteen, miles an hour, and as it reached a point sixty-five or seventy feet from the crossing there was no obstruction whatever towards the direction from which the train, thirty or forty feet away, was coming at a speed of six miles an hour; that ten feet from the curb line in that direction, and thirteen feet from the track on their side, and placed on a pole fourteen feet high, was a wig-wag signal, which was a round disc twenty-four inches in diameter, on which was the word "Stop" and a gong, and that as they approached the crossing the signal was swinging and the gong ringing; that on the opposite side of the track and thirty feet from it, another automobile had stopped; that the automobile could have been stopped in ten or twelve feet; and that he possessed fairly good sight and hearing; and that he made no effort to avoid the collision with the train. An attempt to cross the track under such circumstances was negligence, on the part of both driver and her brother. Nor, in view of such facts, can a recovery be based on the humanitarian doctrine.

**4. ————: ————: Presumption of Due Care.** The presumption that a traveler approaching a railroad crossing was using due care is indulged only when there is no evidence that he was. It cannot be indulged in the light of facts which show that it is incredible that he was unaware of the approach of the train, and ·which every one else similarly situated saw and heard, and which, seen and heard, constituted an immediate and insistent warning of danger.

**5. ————: Humanitarian Rule.** The humanitarian doctrine does not permit a recovery for the injured occupants of an automobile struck by a railroad train at a street crossing, on the presumption that if a brakeman had been stationed on the rear car of the backing train he would have seen the automobile in time to warn them, or to have effected the stopping of the train, where they were approaching the crossing at ten or twelve miles an hour, with every opportunity to see and hear, and with ample space to stop before coming to the crossing track, and were warned to stop by a plain wig-wag signal, and by an automobile which had stopped on the opposite side of the track. Under such circumstances the brakeman, if one had been stationed on the rear car, would have had a right to presume that they would see and hear, and being warned would stop before driving upon the track; and such presumption failing, it cannot be further presumed that the brakeman, after. seeing that they were oblivious to the warning and dangers, would have observed their failure to stop in time to have signaled the engineer or other brakemen in time to have secured the stopping of the train before the automobile reached the crossing, where it was traveling ten or twelve miles

an hour and was thirty or forty feet from the crossing, and the train traveling five or six miles an hour was half that distance.

6. **CONTRIBUTORY NEGLIGENCE: Humanitarian Rule: Presumption upon Presumption.** A verdict cannot be based upon one conjecture which is itself founded upon another conjecture.

---

Corpus Juris-Cyc. References: **Railroads,** 33 Cyc., p. 1017, n. 73; p. 1071, n. 7; p. 1105, n. 35; p. 1129, n. 68.

Appeal from Carroll Circuit Court.—*Hon. Ralph Hughes,* Judge.

AFFIRMED.

*Franken & Timmons* for appellants.

(1) The failure of the defendants to observe the provisions of Section 29 of Ordinance No. 28 of the Town of Carrollton, requiring an employee to be stationed on the rear end of every train backing within the limits of said town for the purpose of giving danger signals, was negligence *per se.* Hale v. Railway Co., 287 Mo. 520; Cytron v. Transit Co., 205 Mo. 716; Hovarka v. Transit Co., 191 Mo. 441; Sluder v. Transit Co., 189 Mo. 107; Bergman v. Railroad, 88 Mo. 678; Dahlstrom v. Ry. Co., 108 Mo. 525; Kelly v. Union Ry. Co., 95 Mo. 279. (2) The negligence of the driver of the automobile cannot be imputed to John L. Sullivan, who was riding therein as a passenger or guest. Rawie v. Ry. Co., 274 S. W. 1035; Corn v. Ry. Co., 228 S. W. 78; Mahany v. Ry. Co., 286 Mo. 601; Boyd v. Kansas City, 291 Mo. 622; State ex rel. Hines v. Bland, 237 S. W. 1018; State ex rel. Transfer Co. v. Trimble, 250 S. W. 396; Treadway v. United Rys. Co., 300 Mo. 156; Montague v. Interurban Ry. Co., 305 Mo. 283; Stotler v. Railroad, 200 Mo. 107; Sluder v. Transit Co., 189 Mo. 138; Farrar v. Railroad, 249 Mo. 210, 219; 29 Cyc. 543; Pusey v. Ry. Co., 106 S. E. 452; Barry v. Harding (Mass.), 139 N. E. 298; Moore v. Admeidinger, 15 Ohio App. 503; Pope v. Holpern, 223 Pac. 470; Clark v. Ry. Co., 224 Pac. 920; Pine Bluff Co. v. Whitelaw, 227 S. W. 13. (3) The deceased, John L. Sullivan, was not guilty of contributory negligence as a matter of law. Mahany v. Rys. Co., 286 Mo. 601, 254 S. W. 21; Treadway v. United Rys. Co., 300 Mo. 156; Rawie v. Ry. Co., 274 S. W. 1031; Melican v. Construction Co., 278 S. W. 366; Durbin v. Ry. Co., 275 S. W. 361; Stotler v. Railroad, 200 Mo. 107; Praught v. Ry. Co., 144 Minn. 309, 175 N. W. 998; L. & N. Ry. Co. v. Scott, 184 Ky. 319, 211 S. W. 747; Hines v. Johnson, 264 Fed. 465; Corn v. Ry. Co., 228 S. W. 78; 18 A. L. R. 303, 309-361, annotation; Taylor v. St. Ry., 256 Mo. 191;

Farrar v. Railroad, 249 Mo. 219; Preston v. Railroad Co., 292 Mo. 442; Kidd v. Ry. Co., 274 S. W. 1090; Rigley v. Pryor, 290 Mo. 10. (4)   Even though John L. Sullivan were guilty of contributory negligence, still there was ample evidence to require submission to the jury the question as to whether the defendant railway company and its servants had ample time to warn the driver of the automobile and the said Sullivan of the near approach of said backing train, by the exercise of ordinary care, after they saw, or by the exercise of ordinary care could have seen, the perilous position of said occupants of said automobile and their obliviousness to danger, which warning could have been heard and acted upon in time to have prevented the death of Sullivan.   Bergman v. Railroad, 88 Mo. 678; Kelly v. Union Ry. Co., 95 Mo. 279; Dahlstrom v. S. Ry. Co., 108 Mo. 525; Ellis v. Railroad, 234 Mo. 680; Maginnis v. Mo. Pac. Ry. Co., 268 Mo. 667; Murrell v. Railroad, 279 Mo. 92; Tavis v. Bush, 280 Mo. 383; Hill v. K. C. Rys. Co., 289 Mo. 204; Logan v. Ry. Co., 300 Mo. 611; State ex rel. Wabash Ry. Co. v. Trimble, 260 S. W. 1000; Morgan v. Railroad Co., 159 Mo. 281.

*Cyrus Crane, S. J. Jones* and *Sam Withers* for respondents.

(1)   The court did not err in sustaining the demurrer at the close of plaintiff's evidence.   (a)   The deceased was himself guilty of negligence.   Burge v. Railroad, 244 Mo. 94; Tannehill v. Railroad, 279 Mo. 168; Leapard v. K. C. Rys. Co., 214 S. W. 268; Friedman v. Rys. Co., 193 Mo. 235; Sorrell v. Payne, 247 S. W. 462; Ry. Co., v. Sellers, 5 Fed. (2d) 31; Paramore v. Ry. Co., 5 Fed. (2d) 912; Trenholm v. Ry. Co., 4 Fed. (2d) 562.   (b)   The admitted negligence of the driver of the car, and deceased's own negligence, either or both were the proximate cause of the death.   Peterson v. Railway, 270 Mo. 67; Lumb v. Forney, 190 S. W. 988.   (c) The humanitarian rule was not applicable.   Taylor & Sons Brick Co. v. Railroad, 213 Mo. 715; Butler v. Railway, 293 Mo. 259; State ex rel. v. Reynolds, 289 Mo. 479; Dyrcz v. Railroad Co., 238 Mo. 33; Beal v. Ry. Co., 256 S. W. 733; Sullivan v. Railroad Co., 308 Mo. 48.   (2)   The deceased, for whose death this action was brought, and his sister, the driver of the automobile were on a joint enterprise. It is admitted by appellant's counsel that the sister, the driver, was negligent.   There can be, therefore, no recovery in this case and the trial court was clearly right in sustaining the respondents' demurrer to the evidence.   Gersman v. Ry. Co., 229 S. W. 170; Tannehill v. Railroad Co., 279 Mo. 171.

LINDSAY, C.—The plaintiff asked recovery of $10,000 as a penalty for the death of John L. Sullivan, who was killed when an automobile in which he was riding was struck by a freight train of de-

fendant Railway Company, operated by the individual defendants, employees of the railway company.

At the close of the evidence for the plaintiff the court gave peremptory instructions for each of the defendants. The appeal is from the order overruling plaintiff's motion to set aside the involuntary nonsuit taken.

At the time in question, January 3, 1923, at a little before three o'clock in the afternoon, the deceased was riding in a Ford touring car, driven by his sister, Evaline Sullivan. The curtains were up. They were the only occupants of the car, and John L. Sullivan sat in the front seat on the right-hand side of his sister. They lived on a farm six miles north of Carrollton, and at the time were on their way to the Wabash depot in the south part of the city of Carrollton, to meet some friends expected to arrive on the afternoon train. They were driving south on Main Street, a much travelled street in said city, which is crossed by the tracks of the defendant railway company. The weather was clear and the street was dry. The Santa Fe tracks do not cross south Main Street in a due east and west direction, but run somewhat from northeast to southwest. Defendant has two main-line tracks at that point. The north main-line track carries westbound trains, and the south main-line track carries eastbound trains. The distance between them is twelve feet. The collision in question occurred on the north main-line or westbound track. At a point about 165 feet east of the center of the crossing a spur track leads out from the north main-line track, and runs thence somewhat northeasterly and parallel with the north main-line track. The spur in its easterly course also connects with another spur track.

The foregoing are the tracks especially connected with the facts attending the collision between defendant's train and the automobile. However, as somewhat more completely showing the scene, reference is made to certain other tracks of defendant. In going south on Main Street, the first track crossed is an east-and-west track, spoken of as a coal track. This crosses Main Street about 125 feet north of the north main-line track, the place of the collision. Also, at a point about sixty-five feet south of the coal track, is another track, which does not cross Main Street, but stops on the east side of Main Street. It is a spur or off-shoot of the coal track that has been mentioned. Going south on Main Street and passing this last-mentioned track, which is about sixty-five feet north of the main-line track, the traveller has a clear view of the tracks of the defendant to the eastward, for about one-half mile. At a point about thirteen feet north of the north main-line or westbound track, and ten feet east of the east street-curb line of Main Street, there was a wig-wag signal. This signal is a round disc on a pole about fourteen feet high. The disc is about twenty-four inches in diameter, and has printed on it in

large letters, the word, "Stop." There is a gong on, or a part of, this signal. When trains are approaching, or are standing within a certain distance of the crossing, the disc swings and the gong rings. The disc can be seen by persons approaching from the north at a distance of several hundred feet. About one hour before the collision occurred, a local freight train of defendant came in from the west, on the south main-line or eastbound track. Several of the cars of this train were left standing on the eastbound track at some distance to the west of Main Street. The engine and other cars thence went eastward for the purpose of switching and setting certain cars, and just prior to the time when the deceased and his sister approached the north main-line or westbound track, the engine and cars of this freight train returned—backed westward, along the spur track that has been described as leading out of the north main-line track at a point 165 feet east of the crossing, and thence on and along the north main-line or westbound track over the Main Street crossing. The train consisted of the engine, which was at the east end of the train and was facing east, and nine cars. The two cars at the west end were flat cars. In backing westward along the spur and thence on the north main-line or westbound track, the cars were upon a slight curve, which prevented the engineer, who was on the right side of the engine, from seeing the crossing. The fireman, who was on the left hand, or north side of the engine, looking westward, could see the crossing.

Upon certain points there is no material variance in the testimony of the witnesses, all of whom were called by plaintiff. The train, as it moved back westward along the spur and upon the north main-line or westbound track, was moving slowly, or at about six miles an hour. The gong on the wig-wag signal was sounding, and the disc was moving. There was testimony that the whistle for the crossing was sounded as the train started to back, and that the bell of the engine was ringing in approaching the crossing. The day was clear. As the train was thus backed slowly westward, the automobile approached the crossing coming from the north. The testimony of several of the witnesses was, that when they first saw it, at a point about seventy-five feet north of the westbound main-line track on which the train was approaching, the automobile was moving at a speed of about ten miles an hour.

As we have heretofore indicated, when the automobile reached the point opposite the track which ended on the east side of Main Street, or about sixty-five feet north from the westbound main-line track, there was no obstruction whatever to the view to the eastward. Virtually all the testimony of those who saw the accident is, that when the automobile in which deceased was riding, was about seventy or seventy-five feet north of the main-line track, the west end of the ad-

vancing flat car at the end of the train in question, was thirty or thirty-five feet east of the crossing. The testimony is that at that time, the speed of the train was about one-half the speed of the automobile. At that time also, an automobile, coming from the south on Main Street, stopped at a point about thirty feet south of the north main-line track, to allow the train to pass. The automobile in which deceased was riding, moving south, was struck near its center, by the end of the flat car of the train. The automobile was pushed westward, and John L. Sullivan was thrown or fell out partly between the rails, at a point a little beyond the west line of the street. The wheels of the flat car passed over his neck, killing him instantly. The automobile was pushed on somewhat farther westward to or near the platform of a water crane. Evaline Sullivan, the driver of the car, was thrown out and so injured that she lived only a few minutes.

The plaintiff called as witnesses the individual defendants who were operating the train, and also the occupants of the automobile which had stopped on the south side of the track; also another witness, who, standing at a point some seventy-five feet away, witnessed the occurrence. The testimony shows that the automobile in which the deceased was riding was owned by his sisters, Evaline and Margaret E. Sullivan, the administratrix; that John L. Sullivan had no interest in the automobile; that he was a single man and lived with his two said sisters on the farm that has been mentioned. The testimony farther is that both of the women habitually drove the automobile, but that John L. Sullivan did not drive it; that it was in good condition—the steering gear was in good shape, and the brakes in perfect condition; that Miss Evaline Sullivan had good eyesight and good hearing; that she and John L. Sullivan came to town frequently, and both were familiar with this crossing. As to John L. Sullivan himself, the testimony was that some years previous to the time in question, he had received an injury to his head, through being kicked by a horse; that as a result, there was a partial paralysis of his left side. His brother Ambrose Sullivan testified that John L. Sullivan didn't have the real use of his left side he should have; that he was a little deaf in one ear—the left ear; that his vision was "fairly good, normal;" that he was slow of speech, and slow of action; that he did not talk or move as readily as an ordinary person; that John L. Sullivan had ridden many times in an automobile over that crossing; knew about the swinging signal at the crossing; often came to Carrollton in the automobile, driven by the one or the other of his said sisters. Miss Margaret Sullivan, testifying as to the sight and hearing of John L. Sullivan, was somewhat indefinite and evasive in her statements. However, her testimony was that John L. Sullivan could hear, and engaged in ordinary conversation, sometimes went to town by himself, went about the neighborhood, "chored around with the

stock on the farm," and that she "supposed" he could see an approaching car a "reasonable distance."

The plaintiff pleaded the provisions of an ordinance of the city of Carrollton making it the duty of defendant when backing a train, to have a man stationed on the top of the car at the end farthest from the engine, to give danger signals; pleaded failure to discharge that duty, and failure to exercise ordinary care· to warn persons; that John L. Sullivan and Evaline Sullivan were unaware of the approach of said train, and that the death of the former was due to the failure of the defendant and its servants in performing those duties. The answer pleaded contributory negligence on the part of John L. Sullivan, and also alleged that he and Evaline Sullivan were engaged in a joint mission, or undertaking, at the time of the occurrence alleged in the petition, and that the negligence of Evaline Sullivan was to be imputed to John L. Sullivan.

It is conceded by counsel for plaintiff that Evaline Sullivan was guilty of negligence as a matter of law.

On the part of plaintiff the contentions are, that failure of defendants to observe the provisions of the ordinance was negligence *per se;* that the negligence of Evaline Sullivan cannot be imputed to deceased, who was riding as a passenger or guest; that John L. Sullivan was not guilty of contributory negligence as a matter of law; that even though he was guilty of contributory negligence, there was ample evidence to require submission to the jury of the question whether defendants and its servants had ample time to warn said Evaline Sullivan and John L. Sullivan of the near approach of the train; could have seen their perilous position and obliviousness of danger in the exercise of ordinary care and warning could have been given and acted upon in time to have prevented the death of John L. Sullivan.

Plaintiff called H. Conklin, the rear brakeman of the train. He testified that he was riding on the southwest corner of the end car, and that his foot was in the stirrup at that corner of the car; that when he first saw the automobile it was about 175 feet from the crossing, and the rear of the train was about 120 feet from the crossing; that when the automobile was "thirty-five or forty feet, about thirty," from the crossing, it slowed down to four, five or six miles an hour, as if it were going to stop, but instead of stopping, it increased its speed; that when he saw ·it was not going to stop he hollered and waved his hand, gave them the signal to stop, and when he saw they did not heed his signal, signaled the other brakeman. Conklin testified that at this time, when he saw the automobile was not going to stop, and he signaled the other brakeman, the rear end of the train was about ten feet from the east curb of the street; that he gave the "violent signal" for stopping, to the middle brakeman, stationed

between himself and the engine; that he got off the car and continued to signal; that he could not see the engineer from where he was. He said it semed to him the automobile swerved to the right a little as it was going on the track.

G. O. Sportsman, the fireman, testified that he was on the left side of the engine, looking westward, and he was ringing the bell as the train backed toward the crossing; that he saw the automobile approaching from the north and it was twenty or twenty-five feet from the track when he first saw it; that it was travelling at a high rate of speed toward the crossing, and "seemed like it lurched as if the clutch would slip or they was going to stop, and the car jumped forward with increased speed." He said he hollered to the engineer— "There goes a car; look out;" that at about the same time the engineer got the signal from the brakeman and applied the brakes. The engineer was called as a witness, and testified that when he got Sportsman's warning, and at about the same time a signal from the brakeman, he did everything he could to stop the train.

John Cooney was a passenger in the automobile which drew up on the south side of the track, at the crossing, and stopped to let the train go by. Cooney said this automobile was about thirty feet south of the track; that he was in the rear seat on the right side; that he saw the train backing from the east; that when he first saw the train, the front end of the rear flat car was about thirty-five feet from the crossing, and that when he first saw the automobile occupied by the Sullivans, it was about seventy-five feet from the crossing. Cooney testified that he did not see any one on either of the flat cars. and said there was not anybody on either of those cars. He said that after the collision he saw Conklin about fifteen feet east of the street, and south of the train. He said the train was going very slowly— about five miles an hour; that he noticed there were two passengers in the automobile coming from the north; that the curtains were up. He said he did not hear any one holler before the collision, but it seemed like he heard some one holler after the collision occurred; that he was looking straight north; that the train stopped suddenly. Defendant read the testimony given by Cooney at the coroner's inquest, wherein he testified there was no apparent slowing up of the automobile, but said they "came right across, just the same as if they hadn't seen the train."

Ed Brockmeier, the driver of the automobile which stopped on the south side of the track, testified that he saw the train backing toward the west; that there was no one, or he saw no one, on either of the two flat cars; that he saw the automobile on the north of the track, and when he first saw it it was about eighty feet from the track. He testified that he heard some one holler just about the time the train struck the automobile; that it was a man's voice. Brockmeier said that

when he stopped his automobile, the end of the train was about thirty feet from the center of the street; that his automobile was upon the east part of the street and the other upon the west part of the street; that he thought it would be plain to be seen to anybody approaching the crossing from the north, that this train was passing over the crossing. He said he saw a man give a signal by throwing up his hand, but he could not say which way the man was looking: "There were too many things happening;" that his mind was centered on the automobile—wondering why they didn't stop. He said he didn't notice that the automobile slacked up any or that it swerved over to the west as it approached. Brockmeier also testified that "just right shortly before the automobile and the train met," he noticed the man that was sitting on the right side; said he started to get up, and, "it seemed to me that just as it struck he was about half ways out of the car, when they hit, and the car turned over, and that's the last I saw of him until I saw him laying there and the wheel was passing over his neck." He further said it was just almost when they struck that he saw the man start to get out.

E. C. Long also saw the collision. He was walking on the sidewalk about seventy-five feet from the crossing, north of it, and on the west side of the street. He said he had a plain view of the crossing. Asked if there was anybody on the flat car he said: "Not that I saw, only the fireman. I saw him back in the cab." He said he saw the man fall out of the automobile; that he lay right where he fell and three sets of trucks ran over him. He said he saw the wig-wag sign swinging, and the bell was ringing; that the automobile was going, he judged, about fifteen miles an hour, and while it was so moving the train was still backing; that they met right on the crossing, and the man in the automobile fell right out; that "just as soon as the car (automobile) tilted over—crushed over—he fell right out." He and some of the others did not think the automobile swerved to the right as it came on the crossing.

As has been indicated, there is a variance between the testimony of Conklin, the rear brakeman, and of Cooney, Brockmeier and Long, upon the question whether Conklin was standing on the stirrup of the end flat car as it approached the crossing. The three named, other than Conklin, said there was no one on the flat car, although as has been stated, Brockmeier said he saw a man give a signal. On the other hand, the engineer and fireman said a signal was received at the engine from the brakeman, three or four cars back of the engine, and received about the same time the fireman warned the engineer of the approach of the automobile to the track. The brakeman, who was three or four cars back of the engine, was not called to testify, but the engineer testified that he got the signal from the brakeman who was near the middle of the train, and on the south side of it. Be

that as it may, and although all of the witnesses upon this question were plaintiff's witnesses, the question whether Conklin was on the flat car as required by the ordinance, was a jury question. The testimony was that in stopping the train the engineer would push a lever to shut off the steam, and pull the brake valve handle, to set the brakes. The end of the throttle he said was about eighteen inches above the brake valve. Both were within reach of his hand from his seat in the cab. His body was turned to the west. He testified that, as the train was backing, he was watching out, and that it required two motions of the hand, and also the turning around of his body, to shut the throttle and also set the brakes; that on this occasion he shut the throttle, and turned and set the brake valve, and did these things as quickly as he could upon receiving the signal.

A witness who qualified as an expert, testified that a train such as this, and with such an engine, going at six miles an hour, could be stopped in twelve feet from the time of the movement of the throttle and the brake valve as described by the engineer operating the engine. The engineer said he did not know the distance the rear car was from the crossing at the time he got the signal. There was a street railway track along the west side of Main Street. The end car passed beyond the street railway line, and stopped not far from the water crane platform which was 102 feet west of the center of Main Street. A witness testified that a Ford touring car of the kind in question, in good condition, and when going ten miles an hour on Main Street, along the place in question, could be stopped by an ordinarily skillful driver in ten or twelve feet.

As we have said, there is enough conflict on the question of negligence of the defendant in failing to observe the ordinance by having **Question for Jury.** a man stationed on the car at the end of the train, to make that a jury question.

The discussion in the briefs turns chiefly to the question whether John L. Sullivan was guilty of contributory negligence, and if so, whether under the evidence, the case was one submissible under the humanitarian rule. As to the first: Counsel insist that the conceded negligence of Evaline Sullivan cannot be imputed to John L. Sullivan, and that he was not guilty of contributory negligence as a matter of law, citing Mahany v. Kansas City Rys. Co., 286 Mo. 601, and Mahany v. Kansas City Rys. Co. (second appeal), 254 S. W. 16; Treadway v. United Rys. Co., 300 Mo. 156; Rawie v. C. B. & Q. Ry., 274 S. W. 1031; Melican v. Whitlow Const. Co., 278 S. W. 361; Corn v. Kansas City Rys. Co., 228 S. W. 78; Durbin v. St. Louis-San Francisco Ry., 275 S. W. 358; Stotler v. Railroad, 200 Mo. 107; State ex rel. Hines v. Bland, 237 S. W. 1018; State ex rel. Shaw Transfer Co. v. Trimble, 250 S. W. 396, and numerous cases from other jurisdictions.

Counsel for defendants call attention to Tannehill v. Railroad, 279 Mo. 158; Leapard v. Kansas City Rys., 214 S. W. 268; Friedman v. Railway Co., 293 Mo. 235; Burge v. Railroad, 244 Mo. 76, and also cases from other jurisdictions.

There is great variance, in the circumstances of the parties concerned, in these cases. Broadly speaking they are cases wherein persons riding in an automobile, but not driving it, sought recovery against a third person, for an injury alleged to be due to the negligence of the third person. In the course of the discussion, there were considered, under the varying circumstances, the relation of the injured party to the driver; their relative ages and experience; their knowledge or want of knowledge of the surroundings; whether they were joint owners of the vehicle, or were engaged in a joint enterprise; whether the injured party was a mere guest of the driver; the question of the authority of the passenger over the driver; whether the injured party was occupying a front or a rear seat; his opportunity to observe, and to act under the situation in which he was placed. In all of them, where there was no such relation between the driver and the person injured as would impute the negligence of the driver to the injured person, there was recognized the rule that the person riding in an automobile, driven by another, is not absolved from all care for his own safety, but is required to use such care as an ordinarily prudent person would exercise under like circumstances. In this case, and as to the purpose of the journey taken by these parties, the evidence shows that John L. Sullivan and his two sisters lived together; that the automobile was owned by the two sisters, left to them by the will of their father; that the one or the other, drove the automobile; that John L. Sullivan did not drive it; that Evaline Sullivan often drove it, and he accompanied her. All that is stated as to the purpose of the trip in question, was, that they were going to met a "friend, or acquaintances," upon a train expected to arrive at the Wabash depot. They often drove to Carrollton, and this crossing, and its surroundings, were well known to them. The evidence shows that in the middle of the afternoon, of a clear day, the automobile was being driven toward the crossing at ten or twelve, or perhaps fifteen miles an hour, and as it reached a point sixty-five or seventy feet from the crossing, there was no obstruction whatever on the east, the direction from which the train was coming. There was some sort of coal shed or office on the spur heretofore mentioned. The warning sign was swinging, fifty or sixty feet in front, and a little to the east of them; the gong attached to it was ringing. At just that time, also an automobile coming from the south, stopped almost in front of them, and thirty feet beyond the main-line track, and also at this very time, the train from the east was backing slow-

*Imputed Negligence.*

*Contributory Negligence.*

ly westward on that track, and not more than thirty or forty feet away from the crossing. In disregard of all of these warnings visible to the eye and audible to the ear of the occupants of the automobile, it was driven upon the crossing. If this was not negligence on the part of both the driver, and of John L. Sullivan, sitting as he did on the front seat, and as the testimony shows, possessed of fairly good sight and hearing, it would be difficult to imagine conduct constituting negligence. We think this is so, whether the theory be taken that the speed of the automobile was checked at thirty or forty feet from the track, and then its speed increased, or, that it came on at an unchecked speed of ten or twelve miles an hour. In either event it could have been stopped within ten or twelve feet. Under either theory, the conclusion is inevitable, we think, that there was an attempt to beat the train across the track. It seems incredible under all the circumstances shown, that they were unaware of the approach of the train; that their eyes and ears caught nothing to give them warning. Counsel for plaintiff argue that the only reasonable inference from the facts is, that Evaline Sullivan went into low speed to prevent stalling on the track, and, that in any event, from the fact that the automobile was slowed down within forty feet from the track, it cannot be said, as a matter of law, that the occupants of the automobile saw the train and attempted to beat it across. Counsel also argue that since at the time the automobile was slowed down forty feet from the track, the end of the train was even nearer than forty feet from the crossing, and that, notwithstanding these facts, the automobile increased its speed, these facts, all combined, tend to show that the occupants of the automobile were unaware of the approaching train, and were not trying to beat it. Of course, if they were unaware of the approaching train, they were not trying to beat it over the crossing. The presumption that a traveller approaching a crossing was using due care, is indulged only, when there is no evidence to show what he did. [Burge v. Wabash Ry. Co., 244 Mo. 76.] The presumption cannot be indulged in the light of facts shown and where everyone else similarly situated saw and heard the things, which, seen and heard, constituted an immediate and insistent warning of danger. They were near a known railroad crossing, going at a moderate speed; an automobile drew up and stopped on the other side almost opposite, and in plain view, the "stop" sign just in front was swinging; its gong was sounding; the approaching train was not distant and moving swiftly, but nearer the crossing than they were, and moving slowly. It was visible to them without turning the body to look, and it is unbelievable that they were unaware of the approach of this train. To say that they were unaware of the approaching train would be equivalent to saying that they closed their eyes and their ears to the warning, sights and sounds immediately near them and

in a place well known to them as a railroad crossing and that they did not see and did not hear from their advantageous situation what every other person near by saw and heard.

The deceased sat where all this was open to him, and where a word, or a touch of the hand, would have been a warning or a token of restraint. If the train had been approaching at a very high rate of speed, a different conclusion would be warranted. Here, all of the testimony is to the effect that this train was approaching at five or six miles an hour; that the train struck the center of the automobile; that the automobile, except or unless it was checked for an instant, and only during that instant, was moving toward the point of contact at about double the speed of the train, and the end of the train was then nearer the point of contact than the automobile, and the automobile was yet at a distance giving ample space to stop it before reaching the track. Evidently the trial court upon this evidence concluded that John L. Sullivan, situated as he was, with fairly good sight and hearing, and related as he was to the driver, and knowing these things, made no timely effort, and failed to exercise ordinary care for his own safety.

It is insisted that the case was submissible under the humanitarian rule; that if a man had been stationed on the rear car, he would have seen the Sullivan automobile in time to warn the occupants, or, to **Humanitarian** have effected the stopping of the train. This is on **Rule.** the theory that Conklin was not on the rear car as he said he was, but that the other witnesses who said there was no one on that car, were correct. For the purposes of the immediate inquiry the statement of those other witnesses is to be taken as true. But this contention is based upon the assumption that the occupants of the automobile were unaware of the approach of the train. It also leaves out of consideration any presumption on the part of the brakeman, if one was on the rear car, that the occupants of the automobile approaching the crossing at ten or twelve miles an hour, under the circumstances shown, with every opportunity to see and to hear, and with ample space to stop, before coming on the track, would see and hear, and would stop, before actually driving upon the track. [Sullivan v. G. & N. I. Railroad Co., 308 Mo. 48.] It further proceeds upon the theory that although the occupants of the automobile gave no heed to the fact that they were approaching a known railroad crossing; got no warning from a swinging stop signal and a ringing gong, between them and the track; saw no automobile draw up on the other side and stop, almost in front of them, in clear daylight; saw no moving train on the track nearer the crossing than they were; yet, would have heard and heeded an outcry given by a brakeman upon the train, which they had not seen, and being thus warned, could and would have stopped the automobile, or, failing to

317 Mo. Sup.—64.

do that, and their failure seen, the brakeman could have secured the stopping·of the train before it reached the crossing. To so hold, would mean that a verdict could be reached upon conjecture and speculation upon one conjecture founded upon or contingent upon another. [State ex rel. Wabash Railroad Co. v. Bland, 281 S. W. 690; Sullivan v. Railroad, 308 Mo. 48; Rollison v. Railroad, 252 Mo: 525; Burge v. Railroad, 244 Mo. 76.]

Counsel for plaintiff have cited many cases under their claim that this case was submissible under the humanitarian rule; but we have reached the conclusion that· under the facts in this case, given the construction most favorable to plaintiff, there is no substantial evidence upon which to apply the rule; that the trial court did not err; and its judgment is affirmed. *Seddon, C.,* concurs; *Ellison, C.,* not sitting.

PER CURIAM:—The foregoing opinion by LINDSAY, C., is adopted as the opinion of the court. All of the judges concur, except *Gantt, J.,* not sitting.