### McELWEE v. CURTISS–WRIGHT CORPORATION.

No. 4343.

District Court, E. D. Missouri, E. D.

Feb. 18, 1947.

Victor A. Wallace and **Leo F. Laughren**, both of St. Louis, Mo., for plaintiff.

Evans & Dixon, of St. Louis, Mo., for defendant.

HULEN, District Judge.

Plaintiff's action is for damages for personal injuries sustained by him on November 3, 1944, when he was struck by an automobile driven by one Fulstone. Plaintiff would fix liability on defendant as a consequence of a joint enterprise, which defendant and Fulstone are alleged to have been engaged in at the time Fulstone's automobile struck plaintiff. Several assignments of negligence are pled. By argument and brief plaintiff urges only the humanitarian doctrine as a basis of recovery.

Findings of Fact.

Joint Enterprise.

1. On November 3, 1944, defendant was engaged in manufacturing aircraft, for the Government, in its factory in St. Louis County. One Fulstone was employed by defendant in the maintenance department inside the plant; his duties did not require him to operate an automobile.

2. Plaintiff was struck by an automobile, owned and being operated by Fulstone on a public highway, when plaintiff and Fulstone were on their ways from their homes to defendant's factory.

3. There were in effect at the time Office of Price Administration rationing regulations governing use of gasoline and automobile tires; the basic allotment of gasoline was not sufficient for Fulstone to operate his automobile on work days between his home and defendant's factory.

4. To secure additional gasoline, under Government regulations Fulstone (and other employees so situated) was required to offer to other employees of defendant transportation on a share-ride basis, and additional gas rations were issued on the basis of the most direct route from operators' homes to the factory.

5. To promote the convenience of its employees in obtaining additional gas rations and to comply with Government regulations, defendant set up and operated an Employees' Service Bureau and through it employees contacted share riders and share riders contacted operators of share-ride automobiles; provided tire inspection service that share-ride automobile operators could meet Government requirements; accepted applications for additional gas rations; certified the use of automobiles in share-ride operation on forms of and as required by Government regulations; took applications to the Government rationing office; after applications had been passed on by the Government bureau and gas ration coupons had been issued thereon by such bureau, delivered such additional gas ration coupons to share-ride car operators through its Employees' Service Bureau.

6. Such service performed by defendant resulted in a saving to automobile oper-

ators of time and inconvenience in going to the Government office.

7. The services furnished by the defendant required the time of a number of defendant's employees. Defendant employed approximately 16,000 persons and approximately 1,400 of such employees used public transportation. To operate defendant's plant and secure sufficient attendance of employees, transportation for employees in addition to public transportation was required and such necessity was met by the share-ride system; such system thereby being a benefit to defendant.

8. Fulstone usually rode from his home to defendant's factory in a car operated by another share-ride automobile driver and car owner and sometimes used public conveyance, and only occasionally used his own car as he was doing at the time plaintiff was injured. By the use of the facilities of the Employees' Service Bureau he made his own arrangements and selection of passengers he would convey between their homes and the factory. He made his own agreements with riders as to the compensation for transportation. He was not required to report such compensation or share any part of it with the defendant. He selected his own route and manner of driving and without consulting defendant changed cars and drivers to meet the convenience of the automobile operators. He and others similarly situated could have made application direct to the Government office for additional gas rations had they so elected.

10. Prior to the 3rd day of November, 1944, Fulstone learned of the share-ride regulations and requirements of the Government through other employees of defendant and through a company paper issued by defendant at the plant. He went to the Employees' Service Bureau maintained by defendant, made application for additional gasoline to use his car for transportation to work at defendant's factory, signed such forms as were used to set up a share ride in the use of his car for transporting employees to and from defendant's factory. The Employees' Service Bureau of defendant furnished Fulstone an application blank as prepared and issued by the Government rationing office and he obtained the signatures of passengers to ride in his automobile under the share-ride system. Such application was transferred through defendant's Employees' Service Bureau to the Government gas rationing office, there approved, additional gas rationing stamps issued and delivered to Fulstone at defendant's factory through the Employees' Service Bureau, and Fulstone was operating on such gasoline his share-ride automobile with share-ride passengers at the time plaintiff was struck and injured.

## Negligence.

11. At the time plaintiff was injured two lanes of traffic were moving west to the entrance of defendant's factory grounds on North Road. Plaintiff was injured on North Road somewhere between that portion of North Road approximately opposite the disposal plant (on defendant's premises) and a distance 300 feet east of the disposal plant. North Road runs east and west and has a black topped paved surface approximately 37 feet wide. There was west bound traffic on North Road at the time plaintiff was injured. The pavement was substantially level where plaintiff was struck with a slight rise to the east.

12. Plaintiff was riding in an automobile driven by one Giles which was moving in the north lane of traffic. Giles' automobile was driven to the north shoulder off the pavement and stopped. Plaintiff got out of the car and with Giles and one Peck, another passenger, started walking west toward the factory gates on the north shoulder of the highway. It was raining at the time and the highway was wet. After plaintiff had walked to a point approximately 15 feet west of the Giles car someone in a car in the south lane of traffic called to plaintiff and offered him a ride. He was then walking approximately one step, or 30 inches, to the north on the north edge of the pavement. He immediately turned to the south and took two or three steps toward and onto the pavement. He failed, before starting toward the car from which he had received an invitation to ride, to exercise that degree of care which an ordinarily prudent person would under the same or similar circumstances,

by looking for and observing cars coming from the east and moving in the north lane of traffic which he was entering and about to cross. Had he exercised such care he would have seen, before moving onto the pavement, the car driven by Fulstone approaching from the east in the north traffic lane.

13. When plaintiff received the invitation to ride Peck was walking one or two steps west of plaintiff. Peck immediately turned, saw the Fulstone car approaching from the east, saw that it was then 15 or 20 feet east of plaintiff, hollered a warning to plaintiff, tried to grab plaintiff, at which time plaintiff was approximately 5 feet onto the highway.

14. On hearing the warning from Peck plaintiff stopped his southward movement, saw the Fulstone car and made a movement back to the north of approximately a step when he was struck by the Fulstone car.

15. When plaintiff changed his movement from the west to the south and started toward and onto the paved portion of the highway, the Fulstone car was then approximately 25 to 30 feet east of plaintiff, traveling at 25 to 30 miles per hour.

16. Fulstone saw plaintiff at approximately the same time plaintiff changed his direction from west to south and started onto the highway, and immediately applied the brakes on his car. The wheels locked and the car skidded, but the Fulstone car did not and could not have been stopped by use of the means and appliances at hand prior to its striking the plaintiff, or a distance less than 30 to 40 feet, going at 25 or 30 miles an hour, on a wet highway, and under the conditions then prevailing.

17. From the time plaintiff stopped his westward movement on the north shoulder of the highway and turned and started south towards the cars in the south traffic lane after getting an invitation to ride, and the time he was struck, not over one to one and a half seconds elapsed.

18. A car traveling 25 to 30 miles an hour would travel 37 to 45 feet per second.

19. Plaintiff took approximately 30 inches to a step and after turning south took approximately 3 or 4 steps, including the movement back to the north after being warned, before he was struck.

20. Fulstone, by the exercise of that degree of care which a very careful person should exercise under the same or similar circumstances, could not have avoided striking plaintiff by swerving his car to the right after plaintiff turned and started to the south, because of the location of the Giles car on the north shoulder and the presence of people (Giles and Peck) on the north shoulder; nor by swerving his car to his left because of the lane of cars in the south lane of traffic; and further because plaintiff was moving into the path Fulstone would have had to take (had he elected to swerve to his left) until a fraction of a second before plaintiff was struck when he stopped and stepped, or started to step, back to the north; nor by use of appliances at hand have stopped the car before it struck plaintiff or slackened the speed thereof so as to avoid striking plaintiff; nor by sounding a horn.

21. Plaintiff's change of direction and movement onto the highway was sudden and his movement "brisk."

22. The injuries sustained by plaintiff were accidental and unavoidable by Fulstone in the exercise of that degree of care which a very prudent person would exercise under the same or similar circumstances.

23. Plaintiff was injured on November 3, 1944, and confined to the hospital to November 26, 1944. He sustained a fracture of his left ankle, bruise over his eye and contusions about his right hip. At the time of trial (December 31, 1946) he still had swelling and weakness in his left ankle, soreness outside the anklebone, pain in back, occasional headaches, and nervousness, as the result of his injuries, and has sustained a partial permanent disability to his left ankle. Plaintiff sustained a salary loss from the time of injury to June 7, 1945, of $2,208.35. He had hospital bills of $277.36 and doctor bills of $200. $7,000 would reasonably compensate him for the injuries sustained when struck by the automobile driven by Fulstone.

Plaintiff's argument of existence of joint enterprise is based on defendant's action

in securing additional gas rations for operators of share-ride automobiles and bringing riders and automobile drivers together and maintaining a tire inspection service. It is urged because such services were a financial benefit jointly to those engaged in the share-ride program and to the defendant that the relationship meets the requirements of joint enterprise. Plaintiff would ignore gas ration regulations issued by the Government, which were the compelling force behind the conduct of defendant, Fulstone and other share-ride drivers. He contends "the effect of such regulations is exactly nothing" insofar as this case is concerned. With this conclusion we cannot agree. A brief review of the regulations will clarify the issue.

O.P.A. mileage rationing through gasoline regulations is found in Ration Order 5C,[1] effective December 1, 1942, superseding Ration Order 5A. The gasoline regulations were designed to control the use and acquisition of gasoline as a means to conserve rubber and to maintain the nation's transportation system during the war emergency. These regulations provided, among other things, that the Office of Price Administration,[2] through its local war price and rationing boards, regulate the use and allowable mileage of passenger automobiles. All passenger automobiles, with certain exceptions, were to receive a small, basic mileage allowance to prevent casting all persons normally using such facilities onto public transportation systems not equipped to handle increased loads. Above this basic ration additional mileage was to be allowed for occupational[3] use of the automobile, but this supplemental allowance was to be tailored in accordance with need.

Missouri was declared in "Area B" and provision made for jurisdiction of boards over issuance of rations.[4] Supplemental rations were provided for by Section 1394.-7701 which allowed Class B or Class C coupon books for use for occupational mileage. Application for supplemental rations might be made to a War Ration Board by the owner or user of a registered automobile, and such occupational mileage was to be established on a basis of that driven between home and a fixed place of work in connection with the principal occupation of the applicant or user. See Section 1394.7703.

Allowance of mileage for occupational purposes was determined by the provisions of Section 1394.7704:

"* * * occupational mileage shall be allowed by a Board for a purpose specified in paragraph (b) of § 1394.7703 if the

[1] Pursuant to authority vested in the Administrator by War Production Board Directive No. 1, issued January 24, 1942, and by Supplementary Directive No. 1Q, issued November 6, 1942.

[2] "§ 1394.7601 Personnel. (a) Ration Order No. 5C shall be administered by the Office of Price Administration through its War Price and Rationing Boards and such other administrative personnel as it may select. The persons appointed to administer Ration Order No. 5C shall have such powers and duties as are herein described and as the Office of Price Administration has delegated and may, from time to time, delegate."

[3] "§ 1394.7551(27) 'Occupational mileage' means mileage driven by a person in carrying on an occupation or to and from a place where such occupation is carried on."

"§ 1394.7551(30) 'Passenger automobile' means any motor vehicle, other than an ambulance, hearse, taxicab, jitney, or a motorcycle, which is built primarily for the purpose of transporting persons on the highways and has a rated seating capacity of seven (7) or less; and includes station wagons and suburban carry-alls, irrespective of seating capacity, which are not available for hire or public rental."

[4] Sec. 1394.7602 declares (a) "For purpose of Ration Order No. 5C a Board shall have jurisdiction over: * * * the issuance of rations (other than basic rations) for motor vehicles normally garaged or stationed in the area which the Board is designated to serve. This, however, is subject to the following exceptions: * * * (ii) If a Plant Area Board or Plant Area Panel or other Board has been designated to serve the workers in specified plants or establishments, that Board or Panel shall have exclusive jurisdiction (except for good cause shown by the applicant) to issue to the workers employed in such plants or establishments all types of rations which such Board or Panel is authorized to issue."

applicant establishes, in connection with the use of the vehicle for that purpose, either:

"(1) That a bona fide ride-sharing arrangement has been made pursuant to which at least four persons (including the operator) will regularly be carried in the vehicle for the purpose of going to and from or carrying on their occupations and that transportation is needed for such purpose: Provided, That each person must certify to his participation in the ride-sharing arrangement by signing the application; or

"(2) That no such ride-sharing arrangement could reasonably be made but that the vehicle carries as many persons as could reasonably be expected in the light of the circumstances in which and the purpose for which it is used; that transportation is needed for such purpose; and that no alternative means of transportation are available which would be reasonably adequate for such purpose. * * *

"(3) If the application is made for a ration to be used for transporting the applicant or principal user of the vehicle to and from a place of employment at a plant or facility listed in § 1394.7706(o) at which more than one hundred persons are employed, or at any other establishment designated by the District Director when such designation will result in the conservation of gasoline, *such application must be certified as indicated thereon by an officer in charge of an organized transportation plant at such establishment."* (Emphasis added.)

Preferred mileage was to be that necessary for carrying out one or more of the following purposes:

"§ 1394.7706(o) By a worker, including an executive, technician or office worker (but excluding a person while engaged in promotional, merchandising, sales, landscaping or decorating activities, wholesale or retail delivery, and a member of the armed forces of the United States or military forces organized pursuant to section 61 of the National Defense Act, as amended), for necessary travel to, from, within or between the establishments or facilities listed below, for purposes necessary to the operation or functioning of such establishment or facilities.

\* \* \* \* \* \*

"(3) Industrial, extractive or agricultural establishments essential to the war effort, including: plants or establishments engaged in the extraction, production, processing, or assembling of any *aircraft,* motor vehicle, ship, marine equipment, armament, implement or engine of war, or necessary part thereof; or of any raw, semi-processed or finished materials, supplies or accessories necessarily used in the manufacture thereof; or of tools, machinery or appliances essential to the manufacture or use thereof; or of munitions or fuel; or of essential medical supplies or essential food or clothing." (Emphasis added.)

■ While there may be some confusion in applying the law of joint enterprise to specific cases, the authorities are in harmony that joint enterprise, (1) can only arise by agreement between the parties to the venture. Most of the cases further hold, the agreement must include an understanding (2) to engage in and carry out a single business enterprise for joint profit, (3) for which purpose they combine their property, money, effects, skill and knowledge, with (4) the right of the members to joint control over the subject matter thereof and the property engaged therein. State ex rel. McCrory v. Bland, Mo. Sup. 197 S.W.2d 669; Neville v. D'Oench, 327 Mo. 34, 34. S.W.2d 491; Hobart-Lee Tie Co. v. Grodsky, 329 Mo. 706, 46 S.W. 2d 859; Tompkins v. Commissioner Internal Revenue, 4 Cir., 97 F.2d 396; Dexter & Carpenter v. Houston, 4 Cir., 20 F.2d 647.

■ Plaintiff has met none of the requirements to show joint enterprise between defendant and Fulstone. The establishment and operation of share-ride transportation at defendant's plant and the rationing of gasoline to share-ride drivers did not originate by agreement. written or oral, express or implied, between defendant, Fulstone and other share-ride drivers. It resulted solely from a mandate of the Government based upon necessity to conserve gasoline and rubber during the war emergency. In its inauguration neither Ful-

stone nor defendant were consulted. Their compliance was not a matter of choice but obedience to the law of the Federel Government. If the operation of the share-ride system was not a matter of agreement the fundamental requirement for joint venture is absent. That the defendant, on promulgation of the Government gas rationing regulations, "immediately seized upon and exploited it to the fullest extent possible as a means of keeping its plant in operation," as urged by plaintiff, does not alter the fact that Fulstone and other like operators were engaging in share-ride programs and operating on additional gas rationing by virtue of the law and not by virtue of agreement with defendant. The certification of employees' applications for additional gasoline by an officer in charge of organizing transportation at defendant's plant was not the result of any agreement with any one; it was a requirement of the Government regulations (Section 1794.7704(3) ). There is no evidence any share-ride automobile operated by virtue of an agreement with the defendant or defendant requested any driver to engage in transportation of employees on a share-ride basis. The use of automobiles was purely voluntary on the part of employees. They were at liberty to cease use of their automobiles at any time.

Defendant derived no income, hence no profit, from operation of the Fulstone share-ride automobile. The income and profit or loss from operation of the car was received and borne solely by the owner of the car. Plaintiff argues that both the automobile driver and the defendant profited from the operation—defendant in the profit from his manufacturing enterprise by having employees on hand not otherwise obtainable, and the driver of the automobile in the wages received from the defendant for his employment. No joint profit is evidenced. Any ·profit or loss defendant realized from operation of the plants was separate from any loss or profit drivers of automobiles realized from use of their automobiles. It is not a separate profit of this character that is contemplated as one of the norms of a joint enterprise, but an advantage or gain resulting jointly to the parties from the enterprise.

There was no combining of joint property, money, effects, skill and knowledge. The action taken by the drivers in the share-ride transportation of workers to defendant's factory was entirely separate and apart from the activities of the defendant. Neither defendant nor Fulstone had any interest in the property used by them respectively and individually in promoting transportation of workers to the factory.

Defendant did not attempt to exercise any control over the cars used by share-ride drivers. Fulstone did not attempt to control the Employees' Service Bureau of defendant. There is no evidence either had any right to such control. Plaintiff argues that defendant's certification of applications for additional gas rations was a measure of control and that its basing additional gas rations upon shortest routes from the homes of workers to defendant's factory was a means of control of routes. The defendant did not direct the route to be taken by the car operator. Car drivers were not required to use any particular route, or the shortest route; they were given gas rations based upon the shortest route. This was a requirement of the Government; not an agreement with anyone. In certifying gas applications defendant acted as an arm of the Government in the enforcement of operations under the gas rationing regulations.

The facts in this case bear some semblance to the case of State ex rel. McCrory v. Bland, supra. There defendants were sued jointly for damages for injuries suffered by plaintiff while working in defendants' home. Plaintiff fell over a mop negligently left on a hall stairway by Mrs. McCrory. The common law doctrine that a husband is liable for his wife's torts has been abolished in Missouri (Section 3680, R.S.Mo., 1939, Mo.R.S.A.) except where a husband would be liable jointly, independent of the marriage relationship. Accordingly the plaintiff sought to hold the husband liable on the ground that he and his wife were maintaining their home as husband and wife and were engaged in a joint venture and therefore the husband was jointly liable. The Supreme Court rejected plaintiff's claim, holding [197 S.W.2d 673]:

"* * * the maintaining of a home by a husband and wife is not the result of an agreement or contract between them. It is *the result of their marital status, a duty the husband owes to his wife under the law. It therefore cannot be a joint adventure because a joint adventure can arise only by contract or agreement between the parties.*" (Emphasis added.)

Applying the law of the McCrory case to the facts in this case, it follows that the operation of the share-ride system in transporting employees to defendant's factory was not the result of an agreement or contract between the defendant and the car operators, but the result of the employees' status under the law, as such drivers, and by virtue of that status certain rights and duties prescribed by law. Defendant's efforts in the enterprise saved time and expense to the defendant in the operation of his factory. This was one of the objects of the law. Defendant's employees, such as Fulstone, had time and expense saved by defendant's efforts. Again that was one of the objects of the law. The efforts and conduct of each promoted the war effort in accordance with regulations "under the law"—but the defendant was not engaged in a joint enterprise with its employees, operating such share-ride automobiles as provided by and directed by law.

In view of the conclusion reached on the question of joint enterprise, decision on the issue of negligence is not called for but we deem it the better practice to make a complete record on all issues presented.

■ Plaintiff was guilty of negligence contributing to his injuries as a matter of law. This prevents recovery on primary negligence.

" 'A pedestrian who goes upon a much-traveled street, over which he knows automobiles are constantly passing, without looking for approaching automobiles in the direction from which automobiles may be expected to approach, subjects himself to danger from approaching automobiles not necessarily arising from the negligence of the drivers, but a danger which is likely to arise though the drivers are in the exercise of the utmost care. If by looking for approaching automobiles, which is but

the act of reasonable prudence under such circumstances, he would discover the negligence of an automobile driver which threatens him in time to avoid being injured, he ought not to be permitted to presume, without looking, that the driver would not be negligent.' Russell v. Bauer-Berger Grocery Co., Mo.App., 288 S.W. 985, 988; Dempsey v. Horton, supra, 337 Mo. 379, 84 S.W.2d 621." Danzo v. Humfeld, Mo. Sup., 180 S.W.2d 722, loc. cit. 726.

■ Contributory negligence is not a defense under the humanitarian plea of plaintiff. This case presents characteristics not unusual where the humanitarian doctrine becomes an issue. The question now is whether or not the perilous position of the plaintiff is discoverable by the person charged with negligence in time for the person charged to avoid injury by the use of the means and appliances at hand. In this case there apparently is no dispute as to when plaintiff entered the perilous position. As long as plaintiff was walking on the shoulder of the highway in a westerly direction he was not in a position of danger of cars being driven on the highway. Failure of Fulstone to discover plaintiff or other occupants of the car prior to plaintiff changing his direction to the south is antecedent negligence, if negligence, and is not a matter of concern on the issue of the plaintiff's right to recover under the humanitarian rule. On the record in this case plaintiff's peril arose and the duty of Fulstone to avoid injury commenced when the plaintiff turned to the south and started onto and across the highway. The testimony of the witnesses is not uniform. The conclusions we have reached are based upon our best judgment of the facts as detailed by the witnesses. The witnesses seem to be in agreement that when plaintiff was warned by Peck of his danger, the Fulstone car was approximately 15 feet east of plaintiff. There is no dispute that the car was traveling 25 or 30 miles an hour. The evidence justifies the conclusion plaintiff was moving briskly. It was raining and the natural urge to get out of the weather, as well as not to delay traffic in the south lane, called for a brisk movement. Peck testified that upon hearing the invitation

to plaintiff to ride he turned and at that time saw the Fulstone car approximately 15 feet east of plaintiff. Plaintiff did not take over three or four steps from the time he received the invitation that caused him to change the direction of his movement, until struck. Fulstone testified he was four or five feet east of the Giles car when he saw plaintiff move toward the highway. We think it reasonable to deduct that he saw plaintiff about the time he changed his direction and started to move onto the highway. Fulstone was then approximately 30 to 40 east of plaintiff. Plaintiff and the Fulstone car were then within one to one and a half seconds of each other. To hold that within so short a space of time Fulstone could have avoided the collision by stopping, slackening the speed of his car, swerving or sounding the horn, would in our judgment be basing a finding upon pure speculation, and not substantial evidence. Sullivan v. Gideon & N. I. Railroad Co., 308 Mo. 48, 271 S.W. 983, 990, and cases cited; Wolverton v. Kurn, 348 Mo. 908, 156 S.W.2d 638; Sullivan v. Atchison, T. & S. F. Railway Co., 317 Mo. 996, 297 S.W. 945, 950. To make a case under the humanitarian doctrine plaintiff has the burden of showing by substantive evidence (Williams v. St. Louis-San Francisco Ry. Co., 337 Mo. 667, 85 S.W.2d 624; Wallingford v. Terminal R. R. Ass'n., 337 Mo. 1147, 88 S.W.2d 361) that the operator of the automobile which struck him had a reasonable length of time after discovering him, or after the time in which his peril should have been discovered, in which to act to prevent the injury. This in our judgment the evidence fails to show. Rafferty v. Levy, Mo.App., 1941, 153 S.W.2d 765; Burton v. Joyce, Mo.App., 22 S.W.2d 890; Goodson v. Schwandt, et al., 318 Mo. 666, 300 S.W. 795; Rollison v. Wabash Railroad Co., 252 Mo. 525, 160 S.W. 994; Keele v. Atchison T. & S. F. R. Co., 258 Mo. 62, 167 S.W. 433; State ex rel. Wabash Ry. Co., et al. v. Bland, 313 Mo. 246, 281 S.W. 690; Massman v. Kansas City Public Service Co., Mo.Sup., 1938, 119 S.W.2d 833; Lotta v. Kansas City Public Service Co., 1938, 342 Mo. 743, 117 S.W.2d 296; Clifford v. Pitcairn et al., 1939, 345 Mo. 60, 131 S.W.2d 508.

In Goodson v. Schwandt, supra [318 Mo. 666, 300 S.W. 796], the Supreme Court of Missouri said:

"To predicate negligence on two seconds of time is in and of itself a monumental refinement. We cannot adjudicate negligence on such pulse beats and hair splitting, such airy nothings of surmise."

Plaintiff is not in the position of having its evidence viewed in a light most favorable to the plaintiff. As the case now rests, plaintiff finds himself with the burden of proof to make his case by a preponderance or greater weight of evidence. But even if we give to the record deductions most favorable to the plaintiff, we are not impressed that plaintiff has shown more than a mere possibility that the accident resulting in his injuries might have been avoided, and such proof does not bring a case within the humanitarian doctrine. Markowitz v. Metropolitan St. Railroad Co., 186 Mo. 350, 85 S.W. 351, 69 L.R.A. 389.

### Declaration of Law.

1. The burden of proof to make out his case rests upon the plaintiff and he is required to make it by the preponderance or greater weight of the evidence.

2. Fulstone, in the operation of the share-ride car owned and driven by him at the time plaintiff was struck and injured, was not the agent of defendant.

3. The relationship between Fulstone and defendant in the operation of the automobile owned and driven by Fulstone at the time plaintiff was struck and injured by the car was not that of joint enterprise or joint adventure.

4. Plaintiff at the time he was injured was guilty of negligence as a matter of law and could not recover for his injuries on primary negligence.

5. Plaintiff's injuries were not due to any negligence of Fulstone.

6. Fulstone was not guilty of negligence under the humanitarian assignment of negligence.

7. Plaintiff's injuries were the result of accident and unavoidable on the part of Fulstone.